CONSOLIDATED FISHERIES COMPANY, a corporation of the State of Delaware, THOMAS H. HAYES, an individual, and RICHARD C. HAYES, an individual,

Appellants,

*vs.*

CONSOLIDATED SOLUBLES COMPANY, a corporation of the State of Delaware, and DAVID LEVIN, an individual,

Appellees.

*Supreme Court, On Appeal, February 28, 1955.*

128

*John Van Brunt, Jr.,* Wilmington, for appellants.

*Samuel R. Russell,* Georgetown, and *William Ginsburg,* Philadelphia, Pa., for appellees.

SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and LAYTON, Judge, sitting.

WOLCOTT, Justice: This appeal brings before us for review a judgment ordering a final accounting and, in part, settling details of the accounting. Portions of the judgment are assigned as errors all of which are set out hereafter.

The facts giving rise to the litigation are summarized.

In early 1951, Thomas H. Hayes (hereafter called Hayes) suggested to David Levin (hereafter called Levin) that he, Levin, erect a plant for the evaporation of weak fish stickwater, which is a waste product of the operation conducted by Consolidated Fisheries Company (hereafter called Fisheries) for the processing of oils and fertilizer from fish, of which company Hayes was treasurer. The evaporation of weak fish stickwater forms condensed fish stickwater, a commercially valuable additive to poultry feeds. The ultimate result was that Levin and Fisheries, on April 6, 1951, entered into a contract for the erection and operation of such a plant upon the land of Fisheries. It seems apparent that Hayes was the controlling force of Fisheries.

Under the agreement of April 6, 1951, Levin agreed to organize a corporation under the name of Consolidated Solubles Company (hereafter called Solubles) and to supply Solubles with capital, not in excess of $50,000, to be used for the erection of a stickwater plant on the land of Fisheries. It was further agreed that Levin would cause

Solubles to enter into the agreement. Fisheries, for its part, agreed to check the construction of the plant and to assist with its best judgment and advice. Upon the completion of the plant, Fisheries agreed to supply to the extent of its ability sufficient weak fish stickwater from its fish processing operation to keep Solubles' plant in full operation during the fishing season which, each year, extends through the months of June to October. Fisheries also agreed to supply at cost all labor, power, supplies and supervision necessary to operate the plant and produce condensed fish stickwater, and also to sell the finished product.

Under the agreement, Solubles promised to pay to Fisheries the cost to Fisheries of all power, oil, supplies, and labor furnished by Fisheries in connection with the operation of the plant. Fisheries' cost of selling the product was to be reimbursed by a 2% commission on the net sale price. The product was to be sold and billed in the name of Solubles, and the proceeds of sale deposited in Solubles' bank account. All payments of costs of operation due Fisheries were to be made on the 10th of the month following the month in which they were incurred.

It was also agreed that in return for its management and for the supplying of weak fish stickwater, Fisheries was to receive 60% of the net profit of Solubles to be determined by deducting from the gross sales of Solubles all costs of operation of the plant and selling the product, exclusive of salaries to officers, federal income taxes, and interest charges, but inclusive of depreciation.

The agreement provided that it should remain in effect for a period of ten years, unless terminated sooner at the option of Solubles for Fisheries' failure to supply sufficient weak fish stickwater in accordance with its undertaking. Upon the termination of the agreement, for either cause, it was agreed that Fisheries should have the right to purchase all of the outstanding stock of Solubles at its book value, to be determined in accordance with a set formula.

Simultaneously, with the execution of the foregoing agreement of April 6, 1951, Fisheries and Levin entered into another agreement by the terms of which Levin, the sole stockholder of Solubles, agreed not

to transfer any of his stock, and granted Fisheries an option to purchase his stock at any time, upon certain terms with which we are not concerned in this appeal.

Shortly after the execution of the agreements of April 6, 1951, construction of the plant commenced and machinery was purchased for installation. It soon became apparent that the contemplated plant could not be constructed for the sum of $50,000 and, accordingly, on May 31, 1951, Levin and Fisheries entered into a second agreement modifying the agreement of April 6, 1951. This agreement obligated Levin to advance a maximum of $70,000 to Solubles in order to enable it to expend up to that amount for the erection of the plant.

The erection of the plant then proceeded, but it became apparent that the complete plant could not be constructed for the sum of $70,000, the maximum amount of Levin's commitment. The testimony as to the understanding, if any, of the parties after this became known is sharply at loggerheads, but, in any event, Fisheries completed construction of the plant at a total cost claimed to be in excess of $95,000, Solubles contributing slightly in excess of $70,000.

Fisheries commenced operation of the plant. Upon the refusal of Solubles and Levin to agree to reimbursement for the excess of construction cost over the sum of $70,000, Fisheries proceeded to sell the condensed fish stickwater produced at the Solubles plant in its own name and to credit on its claim all the net receipts from sales, with the exception of a nominal amount paid over to Solubles.

From this point on, the difficulties and disagreements between the parties multiplied. Fisheries claimed the right to retain the proceeds of sale of Solubles' product until it had reimbursed itself for the cost of plant construction in excess of $70,000, while Solubles claimed that Fisheries had agreed to erect the plant at a cost not to exceed $70,000, and denied that Fisheries had any right to reimbursement for the excess cost from the proceeds of sales, or from any other source. It further claimed that in fact the cost of the plant was actually approximately $49,000, and that in any event as to the amount of cost over $70,000, Fisheries was a volunteer and entitled to no reimbursement.

The dispute eventually culminated in the litigation now before us. Solubles filed its complaint in the Court of Chancery asking for an injunction to prevent Fisheries from selling Solubles' product in its own name, from failing to deposit the proceeds of sale in Solubles' bank account, and for an accounting of the monies advanced by it in the construction of the plant and of the proceeds of the sales by Fisheries.

The Vice Chancellor issued a preliminary injunction ordering Fisheries to refrain from selling Solubles' product in its own name, and from further refusing to deposit the proceeds of sales in Solubles' bank account. On the application of Fisheries the Vice Chancellor stayed the issue of the preliminary injunction, but on review this court reversed the stay, 34 *Del.Ch.* 24, 99 *A.2d* 253. Thereafter, this court affirmed the Vice Chancellor and ordered the preliminary injunction continued until final judgment. 34 *Del.Ch.* 60, 99 *A.2d* 497.

After final hearing, the Vice Chancellor entered a judgment making the preliminary injunction final, and ordering that Fisheries account to Solubles for the cost of construction of the Solubles plant and for the cost of operation for the years 1951 and 1952.

From this judgment Fisheries has appealed asserting that the Vice Chancellor committed error in his decision that the preliminary injunction be made permanent and in his decision upon certain items in the accounting which he decided adversely to Fisheries.

Initially, we can dispose of one point on the concession of counsel for Fisheries. After the docketing of this appeal Fisheries exercised its option to purchase all of the outstanding stock of Solubles owned by Levin, and counsel for Fisheries now concedes that the question of the permanent injunction has become moot and therefore abandons the application for review of this portion of the judgment. We accept this concession and will, accordingly, not disturb the issue of the permanent injunction.

The other questions raised by the appeal are, however, urged upon us vigorously and with them we must cope. Fisheries urges that the Vice Chancellor committed error in the following findings:

1. That the responsibility of Solubles for the erection and equipment of the plant was limited to the sum of $70,000, and that Fisheries alone is responsible as a volunteer for all sums spent above that amount for the erection and equipment of the plant.

2. That all charges made by Fisheries for the use and rental of equipment in the years 1951 and 1952 be disallowed.

3. That the maximum amount of fresh water supplied by Fisheries for Solubles' use in its plant for the period from June to October 15, 1951 was 700,000 gallons.

4. That the rate for electric power to be charged by Fisheries is .015 cents per kilowatt hour.

5. That the amount of fuel oil consumed in Solubles' plant for the year 1951 was 83,000 gallons.

6. That in computing "cost", the basis of all charges to be made by Fisheries, no charge for handling, overhead or supervision shall be included.

7. That the fees of the expert witnesses called to testify by Solubles at the hearing shall be taxed against Fisheries.

We will dispose of the assignments of error in the order in which they are set forth and in so doing will refer more particularly to the evidence relating to each in order to clarify the point in issue.

### THE AMOUNT PAID BY FISHERIES FOR CONSTRUCTION IN EXCESS OF $70,000.

The Vice Chancellor held that the responsibility of Solubles for the erection and equipment of the plant was limited to the sum of $70,000, and that all sums expended over and above that amount were the sole responsibility of Fisheries. It was also held that the "plant" for the condensation of weak fish stickwater contemplated by the parties meant a plant having all buildings, machinery, equipment, piping, etc., necessary for the conduct of a complete condensing process. That portion of the ruling which prohibits recoupment by Fisheries of

sums spent for this purpose over and above the sum of $70,000 is attacked as error.

Solubles argues that the finding of the Vice Chancellor should be sustained because, either the written agreements between the parties firmly bound Fisheries to erect a complete "plant" at a cost not to exceed $70,000, or Fisheries induced Soluble and Levin to enter into the contracts by making representations and warranting that it could and would build the plant at a maximum cost of $70,000.

We will first take up the argument based upon the written agreements. The initial agreement of April 6, 1951, contrary to the argument made by Solubles, did not require Fisheries to erect a plant at all. Quite the opposite is the fact. The recitals in the agreement make it clear that Solubles was to be organized to, *inter alia,* "erect a fish 'stickwater' plant". Fisheries, for its part, undertook "to check the development and construction of the 'stickwater' plant and to assist with its best judgment and advice in connection therewith." With respect to liability to finance the construction of the plant, however, the agreement is clear beyond any doubt that Solubles and Levin could not be called upon to finance the construction beyond the total sum of $50,000. We can find nothing in the first agreement of April 6, 1951 to support Solubles' argument that Fisheries was bound by contract to erect a plant at a specified maximum cost. In our opinion the only rational construction of this first agreement is that, at most, Fisheries was obligated to use its special know-how to oversee and supervise the construction of a plant to be built by Solubles.

After actual construction started, it became apparent that the sum of $50,000 would prove to be insufficient to complete the project and, accordingly, the agreement of May 31, 1951 was entered into. However, the only modification of the April 6, 1951 agreement, so far as is important in this connection, was to increase the maximum liability of Solubles and Levin from $50,000 to $70,000. The other provisions of the April 6th agreement were left unchanged and were expressly ratified and confirmed.

We think, therefore, that the written contracts between the parties fall far short of the interpretation Solubles places upon them.

It is true that they place an outside limit on the contribution of Solubles and Levin, but we can find in them no undertaking on the part of Fisheries to build a plant for not more than $70,000.

In our view the written agreements go no further than to establish some of the terms of a joint adventure the parties were about to enter into. No particular formality is required for the establishment of such a relationship. It is sufficient, for the purpose, if the parties agree to combine their property, money, efforts, skill, or knowledge to carry out a single business enterprise for profit. 48 *C.J.S., Joint Adventures,* § 1; 30 *Am.Jur., Joint Adventures,* § 10. The agreements clearly show an intent on the part of the parties to combine to a limited extent their property, money, skill and knowledge to establish a business enterprise for their mutual profit.

The relationship of the parties under the agreements being that of joint adventurers, the ordinary rules governing such relationship would apply, and it seems well settled that where one joint adventurer advances his money in excess of his proportionate share of the enterprise, he is entitled to be reimbursed therefor before the profits of the enterprise are divided. 30 *Am.Jur., Joint Adventures,* § 51; 48 *C.J.S., Joint Adventures,* § 10. See also *Crenshaw v. Crenshaw,* 61 *S.W.* 366, 22 *Ky.LawRep.* 1782; *Cain's Adm'r v. Hubble,* 184 *Ky.* 38, 211 *S.W.* 413, 6 *A.L.R.* 146; *In re Taub,* 2 *Cir.,* 4 *F.2d* 993. As a general rule, also, even a volunteer who pays the obligation of another is entitled to reimbursement from the obligor when he takes advantage of the act of the volunteer. 40 *Am.Jur., Payment,* § 23. It is quite clear from the record before us, and was so found by the Vice Chancellor to be the fact, that the complete "plant" cost in excess of $70,000 and that Fisheries paid the excess. Without this expenditure by Fisheries, there would have been no "plant" capable of earning the profit, of which Solubles now demands an accounting.

We think, therefore, that the Vice Chancellor's ruling cannot be supported upon the theory that Fisheries was obligated by the written agreements to erect the plant for the sum of $70,000.

We turn now to the argument of Solubles that it was induced to enter into the agreements, or the enterprise, by reason of oral war-

ranties and representations made by Fisheries through its agent, Hayes.

Implicit in the decision of the Vice Chancellor is the conclusion that Hayes, on behalf of Fisheries, promised or warranted to Levin that he would see to the construction of the plant, that many materials were on hand which he could supply at cost, and that the total cost of construction would not exceed the sum of $70,000. He further concludes that, solely in reliance upon these representations, Levin entered into the project. The Vice Chancellor, therefore, held that it was Fisheries' responsibility to erect the plant in a proper manner at a cost not in excess of $70,000. These findings are based entirely upon the testimony of Levin and his wife.

Ordinarily, when sitting in an appeal from Chancery, this Court will not make an examination of the evidence to reach independent conclusions of fact, but will content itself with examining the evidence to determine whether the factual findings of the court below are supported by the record. If they find support in the record we adhere to them. When the evidence does not support the findings of the court below, however, this court sitting in review of an equity cause may make its own factual findings and direct the court below to give effect to them by the entry of a judgment. We have this authority and are restrained in its exercise only by our sense of judicial propriety. See *Peyton v. William C. Peyton Corporation*, 23 *Del.Ch.* 321, 7 *A.2d* 737, 123 *A.L.R.* 1482, and *New York Trust Co. v. Riley*, 24 *Del.Ch.* 354, 16 *A.2d* 772.

We turn then to the evidence, and particularly the testimony of Levin to determine how much reliance in fact Levin placed upon the statements of Hayes made during the negotiations which culminated in the written agreements. We observe that the statements of Hayes in question were couched in the form of estimates and do not of themselves import a warranty. It is true that Levin specifically testified that he definitely relied upon the statements and figures submitted by Hayes and that as a result of that reliance he entered into the enterprise. While he so testified, however, his testimony in this respect is contradicted by his admitted actions.

After some preliminary conversations on the telephone of a very general nature Levin and Hayes met in Lewes, Delaware, in the latter part of March of 1951. At that meeting Hayes showed Levin certain figures which Levin testified constituted the representations inducing him to execute the first agreement. These figures appear on Plaintiff's Exhibit No. 5. This exhibit contains on the left-hand side a column of three figures totaled to a sum of "43,000". There is no descriptive notation to indicate what they represent, but according to Levin's testimony the figures represented Hayes' estimate of the total cost of the plant. Levin explains the figures as follows: $26,000 for the erection of the plant and the installations; $8,500 for a boiler, and $8,500 for buying the rig and setting it up, to make a total of $43,000.

It is difficult to accept the proposition that two men of the caliber of Hayes and Levin, both experienced in business and financial matters, could have intended and understood a column of four figures standing alone as a sufficiently firm representation of cost of construction to constitute a warranty with the result that Fisheries would be bound to the payment of all excess cost of construction.

Furthermore, even if the Hayes figures be given such preponderant importance, it is apparent from Levin's own testimony that he was taking nothing for granted, and in fact did not rely on Hayes' estimate of costs. This is more than amply demonstrated by a second column of figures in Levin's handwriting which appears on the right-hand side of Plaintiff's Exhibit No. 5. This column of figures totals the sum "444". Levin testified that they were added by him "after I came back from Buffalo in order to make a comparison with the figures that Mr. Hayes had given me", and were a revised estimate of total cost in the amount of $44,400. Not only, therefore, did Levin obviously not accept and rely upon the Hayes' estimate of cost, but he, himself, undertook to make his own analysis of the cost by going to Buffalo to inspect a second-hand evaporator they contemplated purchasing, and to confer with the seller on the cost of installation.

After his visit to Buffalo, Levin prepared a handwritten paper which appears in the record as Defendant's Exhibit No. 28. This consists of ink notations corrected in pencil on a piece of yellow pad paper.

The handwriting is that of Levin. The document itself is more suggestive of notes hurriedly made during a discussion of possible costs than of a detailed and firm cost analysis. But the important thing in connection with it is that it was prepared by Levin and shown by him to Hayes.

Defendant's Exhibit No. 28, which apparently is the most detailed estimate of cost of construction of the plant made by any one, was nevertheless lacking in several important particulars. There was no allowance for labor in installing the equipment, and there was no estimate of cost of installation of piping. It now appears that the cost of the latter item in round numbers was, according to Fisheries, approximately $34,000.

The result is that the first contract of April 6, 1951 was executed by the parties without any detailed cost estimates which could reasonably be expected to be an approximation of the total eventual cost of construction. Indeed, the experience gained from the preliminary construction work indicated that the original guess of $50,000 would be far under the actual cost and, therefore, the Levin contribution to the project was on May 31, 1951 raised to $70,000.

In view of this evidence, we think the Vice Chancellor should not have accepted at its face value the statement of Levin, denied by his actions, that he entered into the contracts solely as a result of representations of costs made to him by Hayes. We think the record is clear that Hayes made no actual representation intending it to be relied upon, and we further think that Levin realized this for he made his own investigation and compiled his own figures for his reliance.

It is the general rule that mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations. *Eastern State Petroleum Co. v. Universal Oil Products Co.,* 22 *Del.Ch.* 333, 2 *A.2d* 138. In any event, even though a representation made be false, that fact is immaterial if the person to whom it is made does not rely upon it but instead acts on his own knowledge. *Eastern State Petroleum Co. v. Universal Oil Products Co.,* 24 *Del.Ch.* 11, 3 *A.2d* 768; *Mackenzie Oil Co. v. Omar Oil & Gas Co.,* 4 *W.W.Harr.* 435, 154 *A.* 883; *Phoenix*

*Oil Co. v. Mackenzie Oil Co.,* 4 *W.W.Harr* 460, 154 *A.* 894; *Montgomery v. Jacob Bros. Co.,* 5 *W.W.Harr.* 112, 159 *A.* 374; *Nye Odorless Incinerator Corp. v. Felton,* 5 *W.W.Harr.* 236, 162 *A.* 504.

Solubles makes no suggestion that Fisheries is guilty of fraud in the negotiation of these agreements. It argues that Hayes' estimate constitutes a "warranty" that the cost of the plant would be kept within the estimate. This argument presumably means that the oral representations became a term of the contract, were not inconsistent with its provisions, and in effect were a guarantee by Fisheries that the total cost would not exceed $70,000.

Ordinarily, testimony offered to prove that a party to a written contract made oral extrinsic promises, warranties or undertakings which increase his written duties or obligations, is excluded from evidence as a violation of the parol evidence rule. There are, however, exceptional cases in which the written contract may in fact not completely express the understanding of the parties and, in such cases, testimony to establish the extrinsic promise or warranty will be received. The burden cast upon the party seeking to establish the extrinsic undertaking in such cases is great. It must ordinarily be shown by the circumstances or by the testimony of disinterested witnesses. See 3 *Corbin on Contracts,* § 585. The case before us does not fall within this exceptional class. The extrinsic warranty, if it has been proved at all, which seems to us most doubtful, rests solely upon the testimony of interested witnesses.

For the foregoing reasons, we are therefore compelled to disagree with the Vice Chancellor that Fisheries had undertaken the obligation of building the complete Solubles "plant" at a maximum cost of $70,000. This decision requires a reversal in part of paragraph numbered 1 in that part of the judgment dealing with the accounting phase of the cause which directed that all sums expended by Fisheries over and above the sum of $70,000 were the sole responsibility of Fisheries.

On this phase of the appeal, therefore, the cause will be remanded with instructions that Fisheries be given allowance in the accounting for all sums spent in constructing the plant.

### ALLOWANCE FOR RENTAL OF EQUIPMENT.

The Vice Chancellor held that the parties agreed orally that Fisheries was at liberty to bill Solubles for the actual cost to it of furnishing equipment used in the construction of the plant. This ruling to the effect that Fisheries was entitled to charge only the actual cost to it of the use of such equipment is not attacked by Fisheries as error. Fisheries does, however, attack as error the further ruling of the Vice Chancellor disallowing any amount for the rental of equipment on the ground that the evidence offered to support it was too remote.

The evidence offered by Fisheries upon this point consisted of the testimony of its office manager, and the testimony of an expert witness who estimated the cost of equipment which would be required to erect the plant.

Fisheries' office manager based his estimate of cost upon job tickets which show the individuals who worked on the construction of the Solubles plant. This witness testified that he knew the individuals, what their jobs were, and was thus able to determine what equipment was used on the Solubles job and for what period of time. He then computed the charge · upon the prevailing rates charged Fisheries by outside contractors for the rental of similar pieces of equipment.

The expert witness estimated the total cost of rental of equipment from an inspection of the actual plant and his knowledge of the type of equipment required in the erection and the amount of time it should be needed on the job. With this as a basis, he computed the total cost by applying a rental rate based upon what it would have cost to hire the equipment from outside sources.

We think the Vice Chancellor was correct in holding that Fisheries had failed to support by evidence this particular item. The agreed basis for the charge is the actual cost to Fisheries; yet the evidence offered by Fisheries is that of estimates based not upon the actual cost to it of supplying the equipment, but of what it would have cost Fisheries to hire the equipment from outside sources, which would

necessarily include an item of profit. Since there is nothing in the record establishing to any extent Fisheries' actual cost in supplying equipment it already had on hand, we think Fisheries has failed to prove any basis for the requested allowance of this item.

The ruling of the Vice Chancellor on this point will be affirmed.

### THE AMOUNT OF FRESH WATER USED.

The Vice Chancellor fixed the maximum amount of fresh water used in the Solubles plant during the period in question at 700,000 gallons. This conclusion was reached after weighing and considering expert testimony produced by Solubles as to the maximum amount of water which should have been used, and a mathematical estimate made by Fisheries based on a comparison of its use of fresh water before the Solubles plant operation and after it was in operation. Admittedly, there was no meter record of fresh water consumption during the period in question.

The question turns on the evaluation of testimony and we see no reason to disturb the Vice Chancellor's ruling.

### ELECTRIC COSTS.

There is no dispute in this connection as to the amount of electricity used by Solubles; the sole dispute is as to the rate to be charged. Fisheries billed Solubles at the rate of .0449¢ per kilowatt hour, while the Vice Chancellor allowed a charge of .015¢ per kilowatt hour. Admittedly, Fisheries is entitled to charge the actual cost to it, but apparently the Vice Chancellor allowed the lesser rate on the theory that it had been agreed to by Hayes and Levin. In our opinion, the supposed compromise was never accepted by Hayes since it was part of an overall suggested compromise of the dispute between Hayes and Levin which was never finally agreed to in all its terms. No reason appears why the actual cost to Fisheries cannot be obtained from Fisheries' records.

We will, therefore, reverse this finding and remand on this point with instructions upon further accounting to ascertain the cost to

Fisheries from its records of supplying electric power to Solubles and to allow Fisheries that rate in computing the allowable charge.

#### FUEL OIL.

[18] The Vice Chancellor disallowed Fisheries' charge for 99,000 gallons of fuel oil, stating that he could not find in the voluminous record the basis for the charge, and allowed a charge for 83,000 gallons which was an estimate by an expert of what should have been used. It appears, however, that Fisheries' charges for fuel oil were made on the basis of meter readings which had been installed at the commencement of operation of the Solubles plant. Apparently, counsel failed to call the Vice Chancellor's attention to the exhibit which establishes this fact.

We will, therefore, reverse on this point and remand with instructions upon further accounting to ascertain from the meter readings the exact amount of fuel oil consumed in the Solubles plant and to make an appropriate allowance to Fisheries.

#### OVERHEAD COSTS.

The Vice Chancellor held that the basis of all charges by Fisheries to Solubles should be the cost thereof to Fisheries, but that no charge for handling, overhead or supervision should be included as a part of such cost. Fisheries had attempted to include as an item of cost a figure representing 10% of labor charges to cover overhead costs. This was disallowed by the Vice Chancellor.

[19, 20] However, it is common knowledge that an allowance for overhead is standard practice, and indeed one of Solubles' own experts testified that 10% of labor cost was a normal charge and represented an actual cost to Fisheries. This item should have been allowed.

We will remand on this point and instruct its allowance.

#### FEES OF EXPERT WITNESSES.

The fees of the expert witnesses called by Solubles were taxed as costs against Fisheries. Fisheries asks for a modification of the

ruling on the ground that the major part of the expert testimony was not a deciding factor in the decision of the court below.

The Vice Chancellor fixed the expert witness fees and taxed them against Fisheries pursuant to the authority of 10 *Del.C.* § 8906. It is to be noted that the cited Code Section makes this a discretionary act on the part of the judge. To the same effect is *Chancery Rule* 54(d), *Del.C.Ann.* We think it unwise to hamper the administration of justice by requiring reliance by the trial judge upon each expert witness called before the fees of that witness may be taxed as part of the costs against the losing party. Such a rule would unduly restrict counsel preparing for trial who must always be prepared to meet, so far as he is able, the vagaries of the judicial mind and the counter tactics of opposing counsel.

We think the taxation of all costs is properly to be left to the sound discretion of the trial judge. Furthermore, the exercise of that discretion will not be disturbed in the absence of a showing of abuse. *Tri-Continental Corp. v. Battye*, 31 *Del.Ch.* 523, 74 *A.2d* 71; *Meade v. Pacific Gamble Robinson Co.*, 30 *Del.Ch.* 509, 58 *A.2d* 415.

### MANDATE.

For the foregoing reasons, the judgment of the court below will be reversed in part and the cause remanded for further proceedings in conformity with this opinion. A special mandate will be required and counsel for Fisheries is requested to submit a form of mandate on notice. The special mandate should contain in substance the following directions to the court below:

1. The portion of the judgment ordering the issuance of a permanent injunction is affirmed.

2. Paragraph 1 of the accounting portion of the judgment is reversed and remanded with instructions upon further accounting to allow Fisheries credit for all sums spent by it in constructing the Solubles plant, irrespective of any maximum limitation.

3. Paragraph 3 of the accounting portion of the judgment is affirmed.

4. Paragraph 5 of the accounting portion of the judgment is affirmed.

5. Paragraph 8 of the accounting portion of the judgment is reversed and remanded with instructions on further accounting to ascertain the rate from Fisheries' records of the cost of electric power supplied by Fisheries to Solubles and to allow that rate in computing the allowable charge.

6. Paragraph 9 of the accounting portion of the judgment is reversed and remanded with instructions on further accounting to ascertain from meter readings the exact amount of fuel oil supplied by Fisheries.

7. Paragraph 14 of the accounting portion of the judgment is reversed, modified and remanded with instructions to include charges for handling, overhead or supervision in determining the basis of all charges made by Fisheries to Solubles.

8. That portion of the judgment taxing the fees of all expert witnesses as costs against Fisheries is affirmed.