PAN AMERICAN TRADE and INVESTMENT CORPORATION, a Delaware Corporation, AMERICAN RAIL AND STEEL COMPANY, a Delaware Corporation, and MILTON E. CANTER,
Plaintiffs,

*vs.*

COMMERCIAL METALS Co., a Delaware Corporation,
Defendant.

*New Castle, August 21, 1959.*

*George T. Coulson,* of Morris, Nichols, Arsht & Tunnell, Wilmington, and *Louis Urow,* Washington, D. C., for plaintiffs.

*John P. Sinclair,* of Berl, Potter & Anderson, Wilmington, for defendant.

MARVEL, Vice Chancellor : Plaintiffs seek an accounting for their claimed share of profits derived by defendant from what plaintiffs

contend was a joint venture mutually agreed on and voluntarily entered into by the parties. Pan American Trade and Investment Corporation is a wholly owned subsidiary of American Rail and Steel Co.; Milton E. Cantor is the president and majority stockholder of American Rail and Steel Co., and plaintiffs engage in the business of buying and selling used rail and other metals of a scrap nature. Canter controls the plaintiff corporations and personally carried on the dealings with defendant which led to the assertion of the claim here made.

Defendant is a major scrap metal company, one of whose divisions is concerned with the purchase and sale of rail and other metal commodities in which Canter trades. Its president and majority shareholder is Jake Feldman, and the officer in charge of its used rail division is Charles W. Merritt.

In July 1948, Mr. Canter, who had previously discussed and continued to discuss during the period here involved a number of other possible scrap metal deals with defendant, learned that Gordon Land Company had purchased from the War Assets Administration a former Army camp known as Camp Gordon Johnson at Carabelle, Florida, a purchase which included a railroad approximately forty eight miles in length leading from the camp to Tallahassee. However, at the time of the original discussions between Canter and defendant concerning Carabelle the railroad leading from Camp Gordon Johnson to Tallahassee could not lawfully be dismantled because of a clause imposed by the War Assets Administration requiring any purchaser of the line to maintain it in place. It was apparently hoped at the time, particularly by members of Congress from Florida, that this rail line could be ultimately sold to someone interested in establishing a logging or other business enterprise at Camp Gordon Johnson, and I am satisfied that in the original phase of what I am satisfied was a joint venture of the parties, their negotiations and agreements were not directly concerned with the rail line to Tallahassee.

Canter having apprised Feldman of the opportunity within the camp, at Feldman's request arranged for an inspection of the materials offered for sale. On August 3, 1948, defendant and Canter formalized

their decision to enter into a joint venture[1] to purchase, in the words of the letter of confirmation of defendant's vice-president Merritt, "any or all of this property." The parties disagree on whether this phrase referred merely to the 6.48 miles of rail within the camp or whether it included the rail line to Tallahassee, but, as stated above, the venture was in my opinion probably confined in its initial stage to the purchase of rail and scrap metals within the boundaries of Camp Gordon Johnson because of the existing restriction requiring the line to Tallahassee to be maintained in situ.

On August 10, 1948, Canter wrote Merritt to the effect that the rail and pipe and some buildings at Carabelle had been purchased by a Mr. Fletcher and expressed regret that "* * * our venture did not work out more satisfactorily * * *," however, on October 19, 1948, Canter in a follow-up effort informed Feldman that he had subsequently learned that Fletcher and a partner were merely exclusive agents for the disposal of the Carabelle property and that the line to Tallahassee could probably be purchased for $300,000 subject to the on site restriction. Feldman inquired as to whether Canter could have the on site restriction removed since an inspection of the line would be wasted effort unless the rail could be lifted.

On November 1, 1948, defendant having meanwhile proceeded to make an inspection, informed Canter of its results and requested him to obtain a thirty day option to purchase the rail for $300,000 and to continue his efforts to get the on site restriction removed, this conversation being confirmed by letter.[2] On the same day Canter wrote Merritt that another company had already secured an option. Defendant replied by letter of November 2 that in view of this development Canter could perhaps see to it that the on site restriction was kept in effect during the thirty day option period and asked to be kept advised. Evidently the option in question was thereafter formally exercised by

1. "It is understood that if successful in buying any or all of this property, it is to be handled on a joint account basis, each of us sharing equally in expenses, investment, and profit or loss." Plaintiffs' exhibit 6.

2. "If this (lifting of the restriction) can be worked out, it is a good deal, but on the basis of being hung for another year and a half we are not interested at any price." Plaintiffs' exhibit 21.

the optionee, Luria Bros. & Co., Inc., but because of a collapse in the used rail market a sale was not consummated.

In January, 1949, Canter learned that the rail was again on the market in the hands of its owner, Gordon Land Company, and so informed defendant. On January 18 and 19, 1949, by telegram and letter, defendant requested Canter to ascertain whether an offer in the neighborhood of $200,000 might be considered favorably. On January 21, 1949, Canter wrote to Feldman informing him that a new would-be purchaser, Hyman-Michaels Company, had in fact made an offer of $260,000. "Thus," wrote Canter "it would seem that your offer entirely eliminates the possibility of our working this out together."

On January 24, 1949, Merritt, persisting in the hope of acquiring the property despite the Hyman-Michaels offer, wrote to Canter requesting his opinion as to whether the on site restriction would in fact be removed, pointing out that such information would determine whether defendant was interested in purchasing the rail at any price. Thereupon, Canter continued his efforts to have the restriction removed, it apparently being assumed by the parties that because of the on site restriction and the depressed state of the current market in used rails the purchase of the rails was within the realm of possibility until a sale to a third party was actually consummated. Canter kept Feldman informed on the matter of getting the restriction removed, and in May or June of 1949, according to Canter's testimony, he informed Feldman that the restriction would in fact be removed. In July, 1949, the on site restriction was cancelled, although the official order or directive on such matter apparently has been lost or mislaid

On July 26, 1949, Canter and Merritt conferred for several hours in defendant's offices in Houston, Texas. There is a sharp conflict in the testimony as to whether the line to Tallahassee was mentioned. Canter testified that the matter was brought up and that Merritt refused to talk about it. Merritt testified that there was no discussion at all concerning the line. There is a further conflict between Merritt's testimony and his prior deposition as to whether he knew at the time of the July 26 conversation with Canter of the contemplated sale of the line at auction, however, shortly before the sale Fletcher called Merritt

and told him that the line to Tallahassee would be auctioned. On August 4, 1949, Merritt attended the sale and was successful in bidding in the property for defendant's nominee.

Shortly thereafter Canter learned of the purchase and called Merritt to assert a claim as a partner in a consummated venture, a claim which Merritt denied. On August 22, 1949, Canter's law associate wrote defendant re-asserting his client's claim under an alleged partnership agreement and threatening to bring action, which was not actually filed until July 25, 1952. In the interim Canter had contracted to purchase from defendant 1,000 tons of rail, a contract which defendant fulfilled by delivery of rail from the Tallahassee line which defendant had "rolled up" and stored in a warehouse in that city.

In considering defendant's motion to dismiss this case in limine then Vice Chancellor Bramhall stated (33 *Del.Ch.* 425, 94 *A.2d* 700, 702) in noting that all of the elements of a joint venture were present in the case according to the complaint;

> "I am unable to find any satisfactory definition of a joint adventure. However, joint adventure has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise for profit, without an actual partnership or corporate designation in which they combine their property, money, effects, skill and knowledge * * * The relationship between joint adventurers, like that existing between partners, is fiduciary in character and imposes upon all the participants the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the joint enterprise * * *"

He concluded that, according to the allegations of the complaint, a cause of action cognizable in this Court had been pleaded. The case having come on for trial, it now becomes necessary to examine the facts in the light of these principles and others governing the law of joint venture in order to determine the parties' precise contractual relationship and the scope of the venture upon which they obviously voluntarily entered.

A joint venture cannot arise by mere operation of law, its legal force being derived from the voluntary agreement of the contracting parties either express or implied, 48 *C.J.S.* Joint Adventures § 3, p. 816 et seq. Furthermore, a joint venture may be abandoned or rescinded in much the same manner as a partnership, *First National Bank v. Rush, Tex.Com.App.,* 210 *S.W.* 521. Applying these principles, I am satisfied that the evidence establishes the fact that not only was there a joint venture and not a mere agency agreement concerning all[3] the Carabelle property but that such venture was not mutually rescinded or otherwise terminated prior to purchase of such property by defendant's agent. Canter's expressions of discouragement not only as to the apparent failure of the original venture within the camp proper but also of the expanded project looking to the purchase of the Tallahassee line did not constitute, in my opinion, an abandonment of the venture but an attempt to overcome defendant's reluctance to make a firm commitment as to price. Clearly, he did not at any time discontinue his efforts to acquire the line to Tallahassee on defendant's terms, and during the summer of 1949, shortly before the restriction was lifted, had conversations in Washington with persons having the power or authority to lift the restriction, and thereby make the railroad an attractive property.

While Canter's agreed contribution to the venture initially was to be that of negotiating the purchase of pipe and rail within the camp, his role as a joint adventurer was expressly as well as implicitly expanded by mutual consent to include negotiations for the purchase of the rail to Tallahassee, and the record clearly sustains a finding that he performed his part of the bargain despite impeding instructions from defendant. Accordingly, defendant had no right to consummate the actual purchase of the Tallahassee line on its own in utter disregard of its fiduciary duty of "utmost good faith, fairness and honesty"

---

3. Significantly, the bill of sale of Gordon Land Company to defendant's nominee, Commercial Construction Company, dated August 8, 1949 (Defendant's exhibit 6), includes not only the rail to Tallahassee but " * * * all yard tracks at Tallahassee, Camp Gordon Johnson and elsewhere * * * being approximately 48.7 miles of main line track, or an aggregate of approximately 62 miles of track."

in dealing with a co-venturer, and plaintiffs are entitled to an accounting.

In so deciding, I conclude that defendant's contention that plaintiffs waived their rights as co-adventurers by a later purchase from defendant of a portion of the rail lifted from the Tallahassee line is entirely without merit. Assuming but not deciding that Canter was aware or should have been aware of the source of the rail which he thus contracted to purchase, his failure to assert a partnership claim in such property under a contract which.already had been breached cannot constitute a waiver of his rights in the consummated venture. As I see it, the parties' rights in the venture became fixed upon its consummation. Accordingly, the claimed right to a set off asserted by the defendant of profits made by plaintiffs on the resale of rail purchased from the defendant is without merit. While plaintiffs are clearly entitled to share in profits made by defendant on resale of property in which plaintiffs had an interest, defendant, on the other hand, may not introduce evidence as to plaintiffs' profits on resale, since, at the time of defendant's breach of contract, plaintiffs had not even begun. to negotiate for the purchase of the rail which it later acquired from defendant.

Remaining to be determined is the form and extent of the accounting to which plaintiffs are entitled. Normally, an accounting action should be conducted in two stages, such method of procedure avoiding the confusion which arises from intermingling evidence on the issue of liability with evidence concerning the minutiae of an account. However, where evidence bearing on the actual accounting has been introduced in a clear and uncomplicated manner at the initial hearing, and particularly where as here the parties express a desire to have the accounting of this long drawn out litigation settled on the present record, it stands to reason that the Court should, if possible, summarily decide both issues. Plaintiffs claim that according to the evidence and applicable law they are entitled to a judgment in the amount of $20,862.72 plus interest (one half of what they claim to be defendant's actual profits), while defendant contends that apart from its counterclaim, plaintiffs as joint adventurers are entitled in any event to no more than half of net profits of $21,000, the parties differ-

ing broadly on the facts and legal principles applicable to the allowance of expenses and the like in a joint venture accounting action.

However, even though plaintiffs, in order to bring an end to this long pending litigation and to avoid further trial expenses, accept as accurate the interlineations concerning defendant's expenses added to his deposition by the accountant, Kleinman, the evidence of circumstances surrounding payment of a commission by the defendant to the ubiquitous agent, Fletcher, is extremely sketchy,[4] and there is grave doubt as to whether such payment is a proper item of deduction from the gross amount derived by defendant from the venture. If it was an unauthorized gift, it is not a proper item to be considered in an accounting between fiduciaries.

Furthermore, notwithstanding plaintiffs' stipulation concerning the Kleinman interlineations, defendant's claimed expenses are to a large extent based on estimates. Finally, in light of my findings as to the existence of a joint venture, I am concerned about the effect, if any, on the expense claims of the parties' original undertaking that each partner would share "* * * equally in expenses, investment and profit or loss * * *"

While it may well be that by further stipulation the actual facts and figures pertinent to the accounting to which plaintiffs are entitled may be fixed, leaving the matter of allowance or disallowance of claimed expenses and interest for decision by the Court, I shall in any event need additional briefs on the legal principles to be applied in a joint venture accounting action in order to arrive at a prcise judgment.

An order may be submitted granting plaintiffs an accounting in the net profits realized from the joint venture and denying defendant's counterclaim, leaving the amount of net profits to be shared equally by the parties to be determined upon the conclusion of such further proceedings as may be directed by the Court after a conference with counsel.

---

4. In answers to interrogatories (defendant's exhibit 4) the witness Fletcher disclaimed recollection of any agreements with defendant at the time of the August 4, 1949 sale of the Carabelle rail.