**Owen Ford SHEPPARD, Jr., Plaintiff,**

**v.**

**Allen F. CAREY and Marine Construction Company, a corporation of the State of Delaware, Defendants.**

Court of Chancery of Delaware.

New Castle.

May 26, 1969.

William T. Lynam, III, of Bayard, Brill & Handelman, Wilmington, for plaintiff.

John M. Bader, Wilmington, for defendants.

DUFFY, Chancellor:

In this action Owen F. Sheppard, Jr. (Sheppard) seeks an order requiring defendant Allen F. Carey (Carey) to deliver to him 395 shares of the common stock of Marine Construction Company, a Delaware corporation, and 5,165 shares of its preferred stock. This is the decision after final hearing.

I

Marine Construction was organized in 1919 and has outstanding 990 shares of common (voting) stock and 150,000 shares of 6% preferred. Prior to 1968 neither Sheppard nor Carey had any interest in the corporation. On January 1, 1968 Sheppard acquired a half interest in a tug and fishing boat (The Reliance) which Carey had owned and operated for many years. Carey is about 62 years old and has spent most of his working life around boats. Sheppard is about 43 and worked at Sun Oil Company for approximately 18 years, mostly in technical maintenance work. Sheppard came to Carey as the result of an advertisement for a partner in The Reliance which the latter placed in a Philadelphia newspaper.

In the spring of 1968 Sheppard learned that the controlling stock in Marine Construction was for sale by Hessler, Inc., a Delaware corporation. After investigation and negotiation, Carey and Sheppard agreed to buy 790 shares of the common and 10,331 shares of the preferred for $50,000. Settlement was held on July 29. Sheppard, who is more sophisticated and experienced in business matters than Carey, had done all of the negotiating, and he arranged the financing. $30,000 was borrowed from Farmers Bank; $20,000 in securities which Sheppard owned was used as collateral for the loan together with a mortgage on waterfront land which the corporation owned. Carey got his share of the balance (one-half of $20,000) from the sale to Sheppard of the half interest in The Reliance. Both parties and the corporation borrowed the $30,000 from the Bank for the settlement.

After settlement the parties took control of the affairs of Marine Construction. A

brief honeymoon was followed by strife in both physical and metaphysical terms. On November 29 Sheppard bought for his personal account, and without Carey's knowledge, an additional 105 shares of the common stock from a third party or parties.

The contract of sale identified Carey as the sole purchaser of the stock. This was done by agreement of the parties and with the knowledge of all of the people in interest. Sheppard contends that he wanted this arrangement in order to keep his interest "one step removed" from a wife from whom he had been divorced in Pennsylvania; he says that this was done as a convenience to him (Sheppard) and upon the understanding that the securities would be transferred to his name or that of his nominee at any time upon his request. Carey, on the other hand, contends that he and Sheppard had agreed before the contract of sale was signed that all stock was to be registered in his (Carey's) name for five years and at the end of that time Sheppard would get one-half of the stock and have a right to buy Carey's half. Meantime, Carey says, he is to have the right to vote all of the shares but not a right to dispose of Sheppard's interest without his consent.

It is thus undisputed between the parties that (a) they agreed to purchase the Marine Construction stock, and (b) the contract of sale was to be made in Carey's name, and (c) Sheppard had a half interest in the stock.

The fundamental question is this: what are the rights and duties of the parties in the Marine Construction stock, particularly the 790 shares of common in which Sheppard admittedly has a 50% interest?

## II

Carey argues that his undertaking with Sheppard was a joint venture; it is said that such a relationship creates fiduciary duties between the parties which in turn permits invocation of the clean hands doctrine and that doctrine precludes Sheppard from getting equitable relief because he secretly bought 105 shares of Marine Construction for control purposes.

## A.

30 Am.Jur., Joint Adventures, § 2 states:

"A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure."

In Delaware our Supreme Court has written a simpler definition in J. Leo Johnson, Inc. v. Carmer, 38 Del.Ch. 579, 156 A. 2d 499 (1959):

"* * * A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise, not amounting to a partnership, for their mutual benefit, in which they combine their property, money, effects, skill and knowledge. * * *"

Sheppard tacitly concedes that the Marine Construction stock, which in the aggregate amounted to control of the company, can be the subject of a joint venture. Compare Consolidated Fisheries Co. v. Consolidated Sol. Co., 35 Del.Ch. 125, 112 A.2d 30 (1955). But, he argues, in a joint venture each party has an equal right of control and Carey's testimony that he has exclusive voting control of the stock for five years is wholly inconsistent with that concept.

It is true that, ordinarily, equality of control is an attribute of a joint ven-

ture. But the concept or relationship is so flexible that I cannot say as a matter of law that equality of control in the conduct of the venture is an indispensable attribute.[1] A contract or agreement between the parties is, of course, the *sine qua non* of the relationship and that may place management of the enterprise in one of the parties. 30 Am.Jur., supra, § 40. The burden of proving such sole management right in the venture is upon the one who asserts it. In short, the burden is upon Carey to prove that his agreement with Sheppard gave him sole management, that it gave him the right to vote all of the Marine Construction stock for five years.

■ There is no point in discussing the evidence in detail. Simply put, I find as fact that the parties did not agree that Carey would have the right to vote the stock for five years or that all of it would be registered only in his name during such a period. As Sheppard argues, the logic of it is that there was no reason why he should make such an agreement. I find that he did not.

### B.

■ But to reject Carey's argument as to exclusive right of control is not necessarily to find that the parties were not engaged in a joint venture. On the contrary, I am satisfied that they were.

■ A joint adventure is not created by operation of law. Pan American T. & I. Corp. v. Commercial Metals Co., 38 Del. Ch. 435, 154 A.2d 151 (1959). It is derived from agreement of the parties but that agreement may be expressed or it may be implied. In J. Leo Johnson, Inc. v. Carmer, supra, the Court said:

" * * * While there must be some sort of contractual relationship between the parties, it may be implied or proven by facts and circumstances showing that such an enterprise was in fact entered into. * * * "

And see *Consolidated Fisheries, supra,* in which the Court said that "No particular formality is required for the establishment of such a relationship."

Here, the testimony of the principals abounds with contradictions and inconsistencies, leaving gaps and uncertainties. But from it all the following appears certain (based largely on Sheppard's testimony):

Sheppard conceived the enterprise, which was to buy majority control of Marine Construction. He invited Carey (his partner in The Reliance) to participate. Carey did after Sheppard "convinced [him] * * * that this was feasible." Sheppard prepaid Carey for his share in The Reliance so that "he [Carey] could come along and join in this venture." The parties examined the boatyard where the company operates, and they estimated the value of certain heavy equipment located there and the land which the company owned. Sheppard negotiated the purchase for all of the common and preferred stock. Carey signed the agreement to purchase all of that stock. The parties agreed to share equally all expenses incurred in buying the stock, they agreed to draw the same salary from the company, they agreed to discuss any differences they had over the operation of the business.[2] They together borrowed

---

1. In J. Leo Johnson, Inc. v. Carmer, *supra,* the Court said:
   " * * * Generally, courts have not laid down any very certain definition of what constitutes a joint adventure, nor have they established a very fixed or certain boundary thereof, contenting themselves in determining whether the facts of a particular case constitute the relationship of joint adventure. * * * "

2. On cross-examination Sheppard testified:
   "Q Was there any particular discussion as to whether the stock was to be held half of the shares owned by you and half by him, or all of them owned by the two of you jointly? Was there any discussion at which that alternative was pointed up?
   A The only discussion I can remember was the one I just spoke to you about,

$30,000 from Farmers Bank to finance the purchase of *all* the Marine Construction shares, the check representing the loan was payable to both of them (and the corporation).

In short I conclude that Sheppard and Carey agreed to acquire together the controlling stock in Marine Construction for their mutual benefit and for this purpose they combined their property, skills and knowledge. They were not merely making independent investments in the Company. They were taking over the active management of the business through their acquisition, together, of 80% of the voting stock. They were thus engaged in a joint enterprise in holding 790 shares of the corporate common and in using that stock for management purposes.

### C.

Since Sheppard and Carey were joint venturers, their relationship was fiduciary in character and imposed upon them the utmost good faith, fairness and honesty in dealing with each other with respect to the enterprise. J. Leo Johnson, Inc. v. Carmer, supra; 30 Am.Jur., supra, § 48; 48 C.J.S. Joint Adventurers § 5b. The relationship between joint venturers is terminated if one of them abandons the enterprise. Here there were serious disagreements between the parties but I am not satisfied, as a fact, that either of them had abandoned the enterprise before Sheppard acquired the additional shares of Marine Construction. Stated otherwise,

neither party was then in a position to unilaterally act without having his conduct measured by fiduciary standards. And by those standards Sheppard was forbidden from acquiring solely for himself any secret advantage in connection with the common enterprise. J. Leo Johnson, Inc. v. Carmer, supra. The acquisition of the 105 shares of stock from a third person may be such an advantage.

In summary, I conclude that neither party is, on the present record, entitled to the claim he makes. Sheppard's right to a half interest in the shares is not subject to voting or other unilateral control by Carey, and Sheppard is not entitled to delivery of 390 shares of common (and shares of preferred) independent of and without regard to any obligation to Carey. The shares were acquired and held for both parties in a joint venture in which they are entitled to equal control of the enterprise.

I will hear counsel as to the form of relief to be given in light of this ruling. Carey is entitled to relief which will protect him from harm which may arise from the acquisition of 105 shares of common by Sheppard in violation of his duty and, under all the circumstances, including Carey's conduct prior to that acquisition, Sheppard is not to be denied all relief by the unclean hands doctrine.

### III

One other matter requires comment. Sheppard claimed and Carey con-

---

whereby he would have half of it and I would have half of it. We were buying the whole block of Hessler's stock, but half was to be his and half was to be mine.

Q Then this discussion was not in terms related to the question of whether the stock would be divided 395 shares to each of you, or whether you would each own a half interest in the 790 shares? The discussion was not put in those terms as I have just put the question?

A Not as you put the question, no.

Q So any discussions about half and half were not clarified in the terms that I just put my question to you?

A Not in the terms that you put your question, no.

Q Were they clarified in any other way in relation to those two alternatives as I stated them?

A Yes. I believe they were, in regards to the fact that a half of 790 is 395.

Q But a half interest in 790 is a half interest in each of the 790 shares, isn't it?

A As you put it, I would say yes."

ceded that he owes Sheppard for one-half of the expenses paid in connection with the acquisition. The amount is not disputed. Carey contends that the clean hands doctrine precludes recovery by Sheppard but I do not understand how that argument applies. In any event, I refuse to apply the doctrine to deprive Sheppard of relief. Judgment will be entered for Sheppard in the sum of $1,436.40, with interest from July 29, 1968.

All other matters argued are reserved for disposition after conference with counsel.