Floyd L. GRAY, Gordon Gray, Edward Gray, a Partnership Doing Business as Snonuts Company, Plaintiffs,

v.

ESKIMO PIE CORPORATION, Defendant.

Civ. A. No. 2266.

United States District Court
D. Delaware.

July 12, 1965.

Robert W. Wakefield, Walker, Miller & Wakefield, and Carl W. Mortenson, Wilmington, Del., for plaintiffs.

Richard J. Abrams, Richards, Layton & Finger, Wilmington, Del., Francis C. Browne and Richard G. Kline, Browne, Schuyler & Beveridge, Washington, D. C., of counsel, for defendant.

STEEL, District Judge.

Plaintiffs have sued defendant for infringement of plaintiffs' federally registered trademark "SNONUTS", their federally registered copyright, and for unfair competition.

Although the pretrial order of January 18, 1965 and the supplemental pretrial order dated January 15, 1965 state that plaintiffs likewise seek to recover for breach of an express and/or an implied contract which they had with defendant, it has been stipulated that these theories of recovery be dismissed with prejudice.[1]

The issue of damages or other relief was reserved until the issue of liability is determined.

## JURISDICTION

When the action was filed, Floyd L., Gordon, and Edward Gray were partners doing business under the name of "SNO-NUTS" Company. Since the action was begun, Edward, the father of the two other plaintiffs, has died. Floyd L. is and was a resident and citizen of Idaho. Gordon is and was a resident and citizen of California, as was Edward, prior to his death. The defendant, Eskimo Pie Corporation, is a Delaware Corporation having its principal place of business in Richmond, Virginia.

Jurisdiction of the unfair competition claim exists under the diversity of citizenship provisions of 28 U.S.C. § 1332 (a) (1), since the amount in controversy, exclusive of interest and costs, exceeds $10,000. Jurisdiction over the trademark and copyright infringement claims exists under 28 U.S.C. § 1338.

## PRELIMINARY STATEMENT

During the 1940s, Edward Gray conceived the idea of an ice cream product, circular in configuration, and having a hole in the middle, (hereinafter sometimes referred to as an "ice cream donut"). In early 1955 he and the other two plaintiffs informally formed the present partnership to commercially develop and exploit the product under the name of "SNONUTS".

Over the years plaintiffs have manufactured several variations of the product. All had one thing in common—the hole in the middle. One variety had cookies on two sides of the ice cream, another on one side only, and a third had no cookies and was chocolate covered. This latter variety was produced by plaintiffs no later than early 1955.

Defendant is in the business of granting licenses or franchises to dairy manufacturing companies under which they manufacture a complete line of frozen confections under the trademark "Eskimo". In connection with these grants defendant sells equipment for use in the manufacture of the confections and also flavoring ingredients for the confections.

Prior to April 12, 1956 when plaintiffs first wrote to defendant about their idea of "SNONUTS", defendant had no comparable product on the market. Plaintiffs claim that it was only after they had made a complete disclosure to defendant in July 1956 of their idea of the product and name that defendant in 1960 introduced for manufacture and sale by its licensees the "ESKIMO Do-nut", which was a product similar in appearance to plaintiffs' "SNONUTS".

Plaintiffs claim that defendant appropriated from them the idea of the ice cream donut, and infringed their federally registered trademark and copyright. They also assert that defendant induced them to refrain from seeking the aid of other companies in developing equipment for the mass production of "SNONUTS" and in obtaining national distribution for "SNONUTS" by large dairy companies, during which time defendant was preparing to (and eventually did) enter the market with its "ESKIMO Do-nut". This was accomplished, plaintiffs say, by defendant pretending over a long period of time to be interested in doing business with plaintiffs, when in fact defendant had no thought of doing so.

1. Stipulation dated January 18, 1965, Docket No. 50.

These tactics of deception, plaintiffs contend, constitute unfair competition in the nature of a fraud.

It is also claimed that defendant has competed with plaintiffs unfairly by "coercing" distributors of plaintiffs' "SNONUTS" to abandon that product.

## TRADEMARK INFRINGEMENT—UNFAIR COMPETITION

Pursuant to an application filed on June 22, 1955, plaintiffs procured the registration on March 5, 1957, of the trademark "SNONUTS" on the principal register in the United States Patent Office as trademark No. 642,400. As trademarked, the name is written in capital letters in a slightly wavy manner, and each letter suggests that it has been formed of snow, with either ice or snow dripping from various parts thereof, and from the top hat of a snowman whose head peers over the top of the letter O. The registration covers "FROZEN CONFECTIONS—NAMELY, ICE CREAM SHAPED LIKE A DOUGHNUT AND DISPOSED BETWEEN TWO EDIBLE WAFERS—in CLASS 46." Defendant admits that plaintiffs have been the owners of this validly registered federal trademark since March 5, 1957.

Plaintiffs have used their trademark "SNONUTS" on labels in combination with such expressions as "The Ice Cream with the Hole" or "Tasty Delightful Deep Freeze Dairy Donuts", or both.

Pursuant to an application filed on December 27, 1957, defendant procured the registration on August 19, 1958, of trademark No. 666,130 for the word "DONUT" on the supplemental register of the United States Patent Office. The mark was for use in connection with "CHOCOLATE COATED ICE CREAM, in CLASS 46".

Defendant has never used the phrases "SNONUTS—The Ice Cream with the Hole" or "SNONUTS—The Ice Cream DONUT", or "SNONUTS" alone or in connection with any other expression. Nor is there evidence that any of its licensees have done so.

Defendant's registered mark "DONUT" is not a copy or colorable imitation of plaintiffs' registered mark "SNONUTS". Defendant has always prominently displayed its trademark "ESKIMO" on commercial labels bearing the expression "Ice Milk Do-nut" or "Do-nut". There is no proof that defendant has used its mark in such way as to cause confusion or mistake among buyers as to the source of its product, or to deceive buyers into purchasing its product when they desired the product of plaintiffs or anyone else. The likelihood of such occurrences is refuted by a comparison of the various materials on which plaintiffs' mark is used and those on which defendant's mark appears.

Plaintiffs argue that they are the owners of the common law trademark "DONUT", and that defendant has infringed it. This argument goes beyond the issues specified in the pretrial orders. See pretrial order dated January 18, 1965, pars. 1 and 4 (infringement of "SNONUTS" alone specified as a trademark infringement issue); par. 8 (proof of plaintiffs' trademark limited to "SNONUTS"). See also Supplemental Pretrial Order dated January 15, 1965, par. I, B.2 (specifies "federal laws" applicable to plaintiffs' claim of trademark infringement).

Furthermore, plaintiffs have agreed to defendant's proposed finding of fact 13 which states:

" * * * Plaintiff never used DONUTS OR DO-NUTS in the manner of a trademark * * *".

Since plaintiffs have not used "DONUTS" or "DO-NUTS" as a trademark, they have no claim to it as such.

"DO-NUT" has been registered as a trademark of *defendant* on the supplemental register in the United States Patent Office since August 19, 1958.[2] As pre-

2. It is unnecessary to determine the validity of this trademark.

viously stated, defendant has always prominently displayed its trademark "ESKIMO" on commercial labels bearing the expressions "Ice Milk Do-nut" or "Donut". There is virtually no possibility that confusion could arise as to the source of defendant's "DO-NUT" in the minds of the public or that defendant could use the term deceptively. Certainly there is no proof of such occurrences.

Defendant has not infringed plaintiffs' registered trademark "SNONUTS".

Plaintiffs have no common law trademark for "DONUT", and if they did have, it was not infringed by defendant. Defendant has not been guilty of competing unfairly with plaintiffs in its use of "DO-NUT" in its labelling or advertising practices.

## COPYRIGHT INFRINGEMENT

 In October 1956 the United States Copyright Office issued to plaintiffs a Certificate of Registration #KK 119755 of a claim to a copyright with respect to the artistic and printed matter appearing upon a paper bag, PX 9B, in which plaintiffs proposed to sell SNONUTS. It is plaintiffs' claim that the wrappers for defendant's ESKIMO DONUTS, PX 11 and 12, the cartons in which the ESKIMO DONUTS were shipped, PX 13, and defendant's advertisements of the product, PX 14, pp. 14–15, infringed plaintiffs' copyright.

Plaintiff has no valid copyright on PX 9B. While the light and deep blue rectangle and material therein contained which appears on the bag, PX 9B, constitute an artistic work which is subject to copyrighting, the other portions of the printed material on the bag do not. This other material simply describes the weight and content of SNONUTS, names plaintiffs as the manufacturer-distributor thereof, states that SNONUTS is plaintiffs' trademark, and describes SNONUTS as "The Ice Cream with the Hole". There is nothing unusual about the lettering which is used. Matters such as these—slogans, names, listing of ingredients or contents, are not subject to copyright. 37 C.F.R.

§ 202.1(a); Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 266 F.2d 541, 544 (2nd Cir. 1959).

The light and deep blue rectangle, and material in it, which alone was subject to copyrighting, was used by plaintiffs in the sale of their products in interstate commerce in 1955, both as an insert in a bag and as a label on a carton containing the product. Although only a small quantity of "SNONUTS" was involved, it was for public sale. This constituted publication, 17 U.S.C. § 26, of the only portion of material on the bag which was subject to copyright. However, neither the insert nor the label carried a copyright notice as 17 U.S.C. § 19 requires. This publication without the statutory notice placed the material in the public domain. The right to secure copyright could not be revived by the publication of the material with a notice at a later date. 37 C.F.R. § 202.2(a) (2); Krafft v. Cohen, 117 F.2d 579 (3rd Cir. 1941); Deward & Rich v. Bristol Savings & Loan Corp., 120 F.2d 537 (4th Cir. 1941). The certificate of registration which was issued to plaintiffs is not evidence that plaintiffs' commercial label always bore a statutory notice of copyright. Krafft v. Cohen, supra, 117 F.2d at 581.

But even if plaintiffs' copyright was valid, defendant did not infringe it. The existence of an infringement of a copyright depends upon whether an ordinary reasonable person would fail to differentiate between the work copyrighted and that alleged to infringe it, or would consider them dissimilar by reasonable observation. Hedeman Products Corp. v. Tap-Rite Products Corp., 228 F.Supp. 630 (D.N.J.1964); Berlin v. E. C. Publications, Inc., 219 F.Supp. 911 (S.D.N.Y. 1963), aff'd, 329 F.2d 541 (2nd Cir. 1964); Doran v. Sunset House Distributing Corp., 197 F.Supp. 940 (S.D.Cal. 1961), aff'd, 304 F.2d 251 (9th Cir. 1962); Allegrini v. De Angelis, 59 F. Supp. 248, 251 (E.D.Pa.1944), aff'd, 149 F.2d 815 (3rd Cir. 1945). A visual comparison between plaintiffs' bag, PX 9B, and defendants accused material, PX 11,

12, 13 and 14 (pp. 14–15), will demonstrate that the latter is neither a copy of the former nor substantially similar to it. An ordinary observer would readily detect the difference between the two and would not understand that defendant's work had originated with plaintiffs. Under the authorities this necessitates a denial of plaintiffs' claim that defendant infringed their copyright.

FRAUD — UNFAIR COMPETITION

What this aspect of the action is *not* about is stated at p. 21 of plaintiffs' brief:

"* * * except for its trademark-copyright aspects, this case does not fit into any of the traditional concepts generally associated with suits based upon fraud, deceit or misrepresentation generally. It does not involve patents, nor disclosure of trade secrets nor does it technically fall within the ambit of breach of a confidential relationship. While it comes close to a suit for breach of contract, it falls slightly short of the requirements for that type of action.[3]

Plaintiffs' affirmative statement of the gist of their claim appears on p. 26 of their brief:

"The gravamen of this action, therefore, is that, after having revealed their product and ideas to Eskimo, the Grays were intentionally deceived by Brown, Gunn and other Eskimo representatives in order that Eskimo might, through their superior economic power, manufacturing know-how and control of franchises, gain control of the national market for the product before the Grays could accomplish that objective. * * * They relied upon the supposed good faith of defendant by withholding action to further their own ends which they would not have done had they known the true situation."

This theory necessitates a detailed consideration of the facts.

Plaintiffs first began to manufacture and sell "SNONUTS" commercially in 1955.

For some time prior to the first conference which plaintiffs had with defendant in July 1956, they were selling "SNONUTS" in the Crystal Theatre in Salinas, California, and in one or two other movie theaters in Sand Point, Idaho.

The donuts for these sales were made in a rudimentary way with hand scoops. Realizing that mass production was required for any real success, plaintiffs attempted to find equipment, or someone to manufacture it, which would make mass production possible. In either 1955 or early 1956, they were in the process of having the Wood Manufacturing Company develop a machine that would do the job. Then plaintiffs began to negotiate with several dairies to market "SNONUTS" on an experimental basis. Since these dairies were equipped with machines manufactured by Anderson Bros. Mfg. Co., plaintiffs terminated their negotiations with Wood, and in January 1956 turned to Anderson for help. On April 20, 1956 Anderson asked plaintiffs for $1,000 to finance some experimental work in connection with converting one of its standard models for plaintiffs' purpose. At this point plaintiffs lost interest in Anderson, at least for the time being.

In the meantime, the Borden Company which plaintiffs had been attempting to interest in marketing "SNONUTS" since May 1955, suggested that plaintiffs get in touch with defendant. This was be-

---

3. None of the varieties of the ice cream donuts sold by plaintiffs were patented. Hence, even if because of the similarity of the appearance of defendant's product to that of plaintiffs', there had been a likelihood of confusion, this would not afford plaintiffs any basis for unfair competition relief under any state law. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

cause it was thought that the Nelson machine which defendant made available to its licensees might be adaptable to the manufacture of "SNONUTS". Furthermore, defendant was a company which could assure national distribution of "SNONUTS", if it was interested in the product.

On April 12, 1956, plaintiffs wrote defendant stating that they understood that the Nelson equipment would be ideal for the manufacture of "SNONUTS", and inquired whether defendant would have any interest in the manufacture and marketing of the product.

On April 18, 1956, defendant replied stating that any decision to take on the "SNONUT" line would have to be made in Richmond, Virginia, the home office of defendant; and on May 21, 1956, it wrote and requested plaintiffs to send samples of "SNONUTS" "with full details on the product, how it is made, manufacturing costs, separating labor, plant overhead, etc." On May 31, 1956 plaintiffs sent a few photographs of "SNONUTS" and stated that although they only showed the two-cookie variety, plaintiffs envisioned the production of either the one cookie or no cookie coated "SNONUTS". Plaintiff asked whether defendant would be interested in exclusive rights for manufacturing and marketing "SNONUTS" and stated that it had made no commitments with others. On June 12, 1956, defendant answered saying that it was interested in discussing the proposition, and suggested a meeting either in Richmond, Virginia or in Salinas, California.

On June 16, 1956, plaintiffs replied stating that Floyd Gray would be happy to make the trip to Richmond if defendant felt that enough could be accomplished to warrant it. Plaintiffs said:

"As we are holding in abeyance any other negotiations, pending the outcome of a discussion with you, it is imperative that our meeting is not delayed too long."

Following receipt of this letter, Robert H. Brown, Vice President of Sales of defendant, wrote a memorandum under date of June 27, to C. K. Nelson and Lee Crist, which read:

"Please read the attached (data concerning "SNONUTS") and advise if we can produce a like type of item on our equipment.

"This may be a great take home plate item—I'm most interested."

On July 5, 1956, Nelson, Vice President of Research and Development for defendant, responded by a notation at the foot of Brown's memorandum:

"Bob. We don't have to buy this we can make Eskimo Donuts. I have been talking about this for years."

On July 13, 1956, Floyd L. and Gordon Gray, for plaintiffs, met with defendant's representatives Brown and Myron Haupert, Manager of the Western Zone, at the Fairmont Hotel in San Francisco. At the meeting, the Grays exhibited models of "SNONUTS" and related the history of its development and various problems they had encountered. Brown expressed a definite interest and stated he would like to have defendant commence a test run of the product in Boston by Thanksgiving of 1956. Compensation for plaintiffs was also discussed. While no specific figures were agreed upon, Brown indicated that plaintiffs should be paid on a royalty basis to which the Grays agreed. The parties also talked about the nature of defendant's equipment, possible prices which might be charged, variations which might be made in the product, i. e. with one cookie, two cookies or no cookies, the sales potential, and other related matters. The meeting lasted for some six hours.

The following day Floyd Gray telephoned Brown and discussed the matter again for about two hours. During the conversation Brown requested that certain new models of the product be sent to defendant's office at Richmond so that certain engineering problems involved in the manufacture of "SNONUTS" could be given priority consideration. Plaintiffs immediately sent them.

Shortly thereafter, plaintiffs had their attorney write a letter to Brown with preliminary suggestions for use in a letter agreement covering the test run period.

About a month elapsed without further communication. On August 11, 1956 plaintiffs wrote Brown and inquired what progress was being made. Brown replied on August 17, and stated that Mr. Reynolds, the president of defendant, had been away on an extended trip and would not return until August 21, and that for this reason it had been necessary to hold up plaintiffs' proposal until Brown could discuss it with him. Brown said he had the complete file in order along with defendant's attorney's suggested agreement covering the test period. Presumably these were for Reynolds' consideration upon his return. Brown also stated that some preliminary engineering work had been done which he would submit to Reynolds. He added that the actual production of "Eskimo Snonuts" was not going to pose much of a manufacturing problem. In conclusion he said:

"I regret the delay in being able to finalize this matter, but as you can understand, I am sure there is nothing I can do until Mr. Reynolds returns. Just as soon as we have had our meeting and reached a final decision, we will contact you."

During the ensuing two months plaintiffs wrote the defendant twice and wired it three times pressing for information on the status of the matter. Finally, on October 16, "Joyce Jones" wired that Brown was out of town but would write upon his return.

On October 25, 1956 Brown wrote plaintiffs and stated that due to some major reorganization activities defendant had not been in a position to take any further action on plaintiffs' proposal. He said that although he had held some preliminary meetings with Reynolds to secure his approval for the Boston test, Reynolds felt that the tests should be held in abeyance until things were more settled. The concluding paragraph read:

"I am pleased to report that things are about straightened out now, and we are in the process of formulating our new operating policies. I feel confident we will be able to reopen our negotiations with you in the next few weeks. In the meantime, if you feel you can best further your project by turning elsewhere, please feel free to do so. I regret that our situation has been such that we could not act any faster on the 'Snonut' proposition. I personally appreciate the position you have been in, and can only apologize for the delays in contacting you."

On October 28, plaintiffs wrote defendant a long letter in which they reviewed the prior negotiations which had taken place and stated that if a contract was consummated, the delay would be negligible, but if such was not the case

"then we feel the long delay has caused us irreparable damage to our company * * * Further delays will prove costly, consequently, would like to have you set an early date for us to meet with you to finalize this matter."

Defendant's letter of October 25 crossed with plaintiffs' letter of October 28. On November 13, plaintiffs acknowledged defendant's letter of October 25, and expressed the hope that negotiations would lead to an "ESKIMO SNONUT". Plaintiffs said that if that was not feasible they were willing to make an arrangement with defendant for the manufacture of "SNONUTS" on the Eskimo Nelson machines located throughout the country.[4]

Plaintiffs heard nothing from defendant after October 25, 1956 for about three and a half months. In the interim,

4. Apparently plaintiffs did not know at this time that defendant sold its Nelson machines and that the purchasers could use them in the manufacture of anyone's product so long as a royalty was paid to defendant. See DX 13F.

plaintiffs wrote defendant three letters and sent it one telegram pressing for a definite answer. In their telegram of January 27, plaintiffs said that they were particularly anxious to know whether

"Eskimo is still interested in doing business with us. If not please so state and return models, drawings and photos."

While plaintiffs' pleas were being ignored, defendant, without revealing the fact to the plaintiffs, began a test run of its own product, Eskimo Do-nuts, in Richmond, Virginia, on November 29, 1956.

On February 4, 1957, H. S. Danner of defendant wired plaintiffs stating that he was unable to give a full reply to plaintiffs' inquiry since Brown was out of the office but that he (Danner) would have the proper people advise the plaintiffs directly.

By early February 1957 defendant was sufficiently encouraged by the public reception of its Eskimo Do-nut, during the Richmond test, for it designed and ordered 100M Do-nut foil bags, presumably for further use in testing.

On February 9, plaintiffs wired defendant it had reopened negotiations with a Pacific Coast manufacturer and that it would sign with a California "outlet" on February 15 unless evidence was received of a deal with defendant.

On March 8, 1957, plaintiffs wrote defendant and stated that Anderson Bros. Mfg. Co., an equipment manufacturer, was developing special attachments for use on their machines for the manufacture of "SNONUTS", and that the equipment was being made ready for the plaintiffs use for the coming season. Once again, plaintiffs concluded by saying that they would like to do business with defendant. Receiving no response to this letter, and having failed to receive the "SNONUTS" models which they had requested six weeks earlier, plaintiffs, on March 23, 1957, sent defendant a bill for $1,003.22 covering the models.

On April 2, defendant wrote plaintiffs disclaiming liability. Further correspondence ensued on the subject and on April 22 plaintiffs wrote that they were preparing to take legal action if the bill was not paid.

Three and a half months later plaintiffs became more conciliatory. On August 2, 1957 they wrote defendant stating that they would like to make an effort to smooth out their differences and to reopen negotiations. Plaintiffs pointed out that they had recently received trademark registration and copyrights so that they could offer "SNONUTS" properly protected.

On August 6, 1957, defendant wrote plaintiffs noting the latter's change of attitude, expressing enthusiasm for the prospect of taking on "SNONUTS", and inquiring what plaintiffs would specifically expect in the way of royalties provided a mutually satisfactory agreement could be worked out by defendant with some of its licensees to produce and market the item. It stated that it was important that the matter of compensation be clarified at an early date so that the defendant's management could appraise the proposition and reach a decision. On August 9, 1957, plaintiffs replied that they were willing to let the defendant name the royalty figure.

Plaintiffs heard nothing from defendant for another two months. In the interim they wrote two letters pressing defendant to conclude the deal. On October 4, 1957, defendant wrote stating that Messrs. Reynolds and Brown would be in San Francisco at the National Ice Cream Convention during the period October 20 through the 25th, and suggested that plaintiff contact Mr. Brown so that he could set up an appointment to discuss the matter with Mr. Reynolds.

On October 20, Floyd Gray, without an advance appointment, went to San Francisco and attempted to reach Messrs. Reynolds and Brown at their respective hotels but without success. He spoke with a Bob Koeble of defendant's organization who said that Mr. Brown had a full schedule for the balance of the day. Gray returned home.

On the following day Gray wired Brown asking for an appointment on "Friday" and requesting that he phone or wire where they could meet. The telegram went unanswered.

During the ensuing five months plaintiffs wrote defendant six more letters impertuning it to reach a final decision. No response was received to any of them, except in one instance when defendant advised that Brown was out of the city and upon his return plaintiffs' letter would be brought to his attention.

On March 24, 1958 Brown wrote plaintiffs apologizing for his delay in replying, stating that he had been in the office only about three days during the month, expressing the opinion that "any further negotiations should be handled on a personal basis since it is rather difficult to incorporate all the necessary details in a letter", and saying that he would contact plaintiffs on his arrival in Los Angeles on April 18 with the thought in mind that the parties could get together in that city during his visit.

On April 11, 1958 Brown wrote plaintiffs and asked that Floyd Gray call him at a designated hotel in Los Angeles between April 16 and 18th so that a meeting could be set up in San Francisco as Gray had requested. Gray telephoned Brown in Los Angeles. Brown said he would call Gray back later to arrange for the meeting in San Francisco, and that he (Brown) was coming with a proposal from Mr. Reynolds. Gray never received the promised call, and, of course, no meeting in San Francisco took place.

Four more months passed without plaintiffs receiving any word from defendant. In the interim plaintiffs wrote defendants three times pressing for some sort of a "tie-up" with it. On August 26, 1958, defendant wrote plaintiffs stating that there would be a meeting of its executive committee in the near future and that the SNONUT matter would be brought before the Committee for consideration at that time. Defendant promised to advise plaintiffs of its decision.

During the next months plaintiffs continued to press defendant for an answer. On November 21, 1958, Gunn, the Vice President and Treasurer of defendant wrote plaintiff and said:

"I regret to have to advise you that the concensus of this [executive] Committee is to the effect that it would not be advisable for Eskimo Pie Corporation to attempt to promote the Snonuts line. So much time and effort has gone into the development of new ESKIMO products that the Committee is of the opinion that we should devote all of our energies to marketing these new products before considering any additional items."

Thus, after more than two years, plaintiffs received a definite answer.

In the fall of 1960 defendant introduced its Eskimo Do-nut nationally. Plaintiffs learned of this through a trade publication.

It is, of course, possible that the procrastination of defendant in answering plaintiffs' letters and telegrams, its failure to meet with plaintiffs according to prearranged plans, its withholding from plaintiffs information concerning its market tests for its Eskimo Do-nuts, its recurrent expressions of enthusiasm for "SNONUTS", the encouragement which it gave plaintiffs to believe that a deal might be worked out with them, and its failure to give plaintiffs a definite answer to the effect that it would not do business with them, were simply attributable to slipshod business methods. In view of the entire record, however, it is more reasonable to believe that defendant's action was deliberately calculated to keep plaintiffs expecting that they would be able to do business with defendant, while at the same time defendant went forward with its own plans to introduce its own product independently of any arrangement with plaintiffs.

The fact that on October 25, 1956 defendant told plaintiffs that if they felt they could best further their own project by turning elsewhere, they should feel

free to do so is of little significance, in view of the context of the letter and what transpired before and after it was written. The record, in its overall effect, leads inevitably to the conclusion that it was the intention of defendant to lead plaintiffs to believe that the door was not closed to the possibility that some kind of a deal between them could be worked out, and indeed probably would be. Defendant has suggested no reason why it took it more than two years after Brown first met with the Grays to advise plaintiffs that no deal was possible. The most reasonable inference is that defendant was deliberately stalling for time so as to keep plaintiff from soliciting the assistance of others or from proceeding on its own behalf, while the defendant went forward with its own plans for marketing its own Eskimo Do-nut.

Throughout its negotiations with plaintiffs, defendant failed to act with that degree of candor which honesty, fair dealing and a proper regard for business ethics required. Instead, it followed a steadied course of seeming deception.

Essentially, plaintiffs' unfair competition claim is based upon the theory that they were the victims of a fraud which defendant perpetrated by affirmative misrepresentations and by silence when good faith required defendant to tell plaintiffs that it was planning to sponsor its own Eskimo Do-nut and had no intention of taking on plaintiffs' "SNONUTS". While the cause of action has multi-state aspects, the parties have agreed that the law of Delaware shall govern the common law issues of unfair competition. (Supplemental pretrial order dated January 15, 1965, par. II, sub-par. 3).

Under Delaware law, even though a representation may be false, that fact is immaterial if the person to whom it is made does not rely upon it. Consolidated Fisheries Co. v. Consolidated Solubles Co., 35 Del.Ch. 125, 137, 112 A.2d 30, 37 (Sup.Ct.1955).

The record makes it abundantly clear that sometime prior to February 9, 1957, plaintiffs concluded that it would be un-wise to rely solely upon defendant either to provide them with the equipment for the production of "SNONUTS" or to serve as the means of distribution. On February 9, 1957, plaintiffs wrote Anderson Bros. and said:

"We are still negotiating with the Eskimo Pie Corporation, however, we have decided against giving them an exclusive for the manufacture and marketing. We have felt that their Eskimo-Nelson machines were best suited for the manufacture of our type of product but feel an exclusive with them would limit coverage on a national distribution."

The letter continued:

"We know that hundreds of plants throughout the country are presently equipped with Anderson machines capable of making our product and all with whom we have discussed it have shown a desire to take on the line. The Frozen Products Comany of Oakland, California are making preparations for the mass production and distribution of SNONUTS in the Central West Coast area. We met with them yesterday, together with your Mr. Harry Puddy, to discuss the nozzle that will be needed to put them into production on their Anderson 34F cup machine. * * *" (Dx 20–G).

On February 19, 1957, plaintiffs wrote Anderson Bros. and said:

"We had been holding all other plans pending our outcome with Eskimo but have found them difficult to do business with, so recently decided not to wait for their decision. Instead we proceeded to carry on from the point where we were prior to our contract with them. We have a number of companies who will take on the line of SNONUTS as soon as we come up with an acceptable method for mass production. At the present moment The Frozen Products Company of Oakland are anxious to get under way for a trial run. They are very enthusiastic

about the product and have expressed their willingness to go all out to get the product on the market. * * * "

The letter continued:

"We would prefer to have Anderson come up with the nozzle to do the job".

and

"we are counting on you people to come up with something that will do the job." (Dx 20–E)

These negotiations with Anderson apparently were ended about mid-March 1957 (Dx 20–C), but were revived in September 1957. Plaintiffs were then receiving expressions of enthusiasm from the ice cream industry for "SNONUTS" but had no machine on which to manufacture them. It was because of this that plaintiffs wrote Anderson on September 25, 1957 and stated that it would like to explore the possibility of some arrangement with it for the joint ownership of "SNONUTS" in return for which Anderson would develop the necessary equipment. In the letter plaintiffs said:

"we continue to receive encouragement from such companies as BORDENS; CARNATION; ARDEN FARM; BEATRICE FOODS; FOREMOST DAIRIES and SWIFT & CO."

Plaintiffs said that "the officials of the major companies we talked to" indicated that "all would be anxious to assume the line (SNONUTS) as soon as equipment or attachments are available for their manufacture." (Dx 20–A).

On July 20, 1957, plaintiffs wrote to The Borden Company seeking to interest it in taking on the SNONUT line for manufacture on the Eskimo-Nelson machines if Bordens had any of them installed. Plaintiff said:

* * * We have been in negotiations with that company [Eskimo] for a period of months but have ceased doing any further with them, con-

vinced that they were trying to get complete control of the product and close a one-sided deal. Recently we found that the product can be manufactured with or without the Eskimo connection as the machines are purchased by the companies. They pay Eskimo a gallonage royalty regardless of what is manufactured. (Dx 13–F).

These letters and many more in the record between plaintiffs and large dairy companies having nationwide distribution, beginning in July of 1957, make it reasonably clear that at least by January of 1957, plaintiffs had decided not to rely solely upon their contacts with defendant as a source of assistance but that thereafter they persistently attempted to interest many other concerns in their "SNONUTS". *Indeed, plaintiffs concede that from April of 1956 when they first wrote to defendant to November, 1960 when defendants began to commercially market its "ESKIMO DO-NUT", plaintiffs made extensive efforts to interest defendant's competitors and others in the commercial exploitation of "SNONUTS" and equipment for its manufacture.* (See defendant's proposed finding of fact 19 to which plaintiffs have agreed).

Furthermore, there is no evidence that plaintiffs, if they had not been in negotiation with defendant, would have done anything which would have been of greater benefit to them than the unsuccessful actions which they actually took.

Plaintiffs have failed to make out a case for relief based upon the alleged fraud of the defendant.

Nor is there any evidence to support plaintiffs' claim that the defendant "coerced" others to abandon plaintiffs' product.

The Complaint will be dismissed.

This Opinion shall be deemed to be the Findings of Fact and Conclusions of Law required by F.R.Civ.P. 52(a).