**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

August 13, 2025

Glenn A. Brown, DMD, Esquire
Real World Law, P.C.
727 Market Street, #4
Wilmington, Delaware 19801

Joseph Christensen, Esquire
Anne Steadman, Esquire
Christensen Law LLC
1201 North Market Street, Suite 1414
Wilmington, Delaware 19801

RE: *Christopher Lundgren v. Alex Brola, et al.*,
C.A. No. 2022-0338-LWW

Dear Counsel:

This letter opinion resolves a petition to dissolve Credit Glory Inc. After trial, I conclude that dissolution under 8 *Del. C.* § 273 is unavailable because the parties did not form a joint venture. The petitioner—a marketing employee—was hired years after the company's inception and granted equity as compensation. He was later fired by the respondent, who never intended a partnership with the petitioner.

Trial also addressed the respondent's motion for sanctions against the petitioner. Although he brought this suit, the petitioner repeatedly flouted his discovery obligations and court orders. I find the petitioner in contempt and shift certain fees.

## I. BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. Credit Glory's Formation

Credit Glory Inc. (the "Company") was formed as a New York corporation in September 2016.[2] It was founded by respondent Alex Brola and non-parties Gary Hu, Michael Wills, Jr., and an unnamed person.[3]

The four founders met in 2012 when each had separate cleaning businesses in New York City.[4] They created a business called the Cleaning Syndicate.[5] This led to a working relationship out of which Credit Glory evolved, sparked by Brola's idea for

---

[1] Pre-trial Order (Dkt. 136) ("PTO"). The trial record includes live testimony of four fact witnesses, 91 joint exhibits, and two deposition transcripts. Trial testimony is cited as "[Name] Tr. __." *See* Trial Tr. (Dkt. 156). Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined. *See* PTO Ex. A (Joint Exhibit List) (Dkt. 134). Pincites refer to internal pagination. Deposition transcripts are cited as "[Name] Dep. __."

[2] JX 1; Brola Tr. 5.

[3] JX 1; Brola Tr. 5.

[4] Brola Dep. 6.

[5] *Id.*

an "additional revenue stream."[6] His idea was to provide web-based customer services to dispute inaccurate credit reports.[7]

Over time, Wills and Brola took on roles as Credit Glory's President and Chief Executive Officer.[8] Brola also handled the Company's marketing, website, and related operations.[9] Hu served as the Company's accountant.[10]

Around August 2017, Hu left the Cleaning Syndicate and Credit Glory.[11] The fourth unnamed Credit Glory founder also departed, leaving Brola and Wills.[12]

### B. Credit Glory's Conversion

In 2018, Brola and Wills began to discuss converting Credit Glory into a Delaware corporation.[13] While those discussions were ongoing, Brola and Wills

---

[6] *Id.* at 7.

[7] JX 25.

[8] Brola Dep. 7.

[9] *Id.* at 7-8. To that end, Brola had registered Credit Glory's domain name creditglory.com in 2015. *Id.* at 63.

[10] *Id.* at 7-8.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 8; *see id*. at 13-14.

hired petitioner Christopher Lundgren to handle the Company's marketing.[14] Lundgren was not given a formal title or Credit Glory equity at the time.[15]

On May 23, 2019, Credit Glory was converted into a Delaware corporation.[16] At the time of the conversion, Credit Glory had three directors: Wills, Brola, and Lundgren, each with one vote.[17] Wills and Brola agreed to give Lundgren a one-third equity share in the Company to reward him for his work.[18]

### C. Wills' Departure

After the conversion, Lundgren retained responsibility for Credit Glory's marketing and was eventually given the title of "Chief Marketing Officer."[19] Brola was CEO, but Wills "call[ed] the shots."[20]

---

[14] *Id.* at 13-14; *see* Lundgren Tr. 51 (testifying that Brola posted on Reddit that he "was looking for someone with additional marketing expertise to help him with Credit Glory").

[15] Lundgren Dep. 68. Lundgren testified that he assumed a CEO-like role. *Id.* at 69.

[16] JX 3; *see* Brola Tr. 8-9.

[17] JX 3.

[18] Brola Dep. 13-14 ("I forget exactly how I met Chris. And he had been doing—he basically took over my job as marketing. So at that point because we were going to add his—we were going to give him some shares for this work, we decided let's do this all at once. We'll get a new draft created, and we'll move to Delaware at the same time."); *id.* ("I believe we gave Chris one third shares.").

[19] *Id.* at 16.

[20] *Id.*; *see* Brola Tr. 23.

In 2020, Wills exited his active roles at Credit Glory.[21] With Wills gone, Brola and Lundgren were the Company's only directors. Equity ownership was divided between Wills (with 8% "phantom" equity), Brola (with 46% equity), and Lundgren (with 46% equity).[22]

Lundgren's purview expanded, including managing other Company executives and sales managers.[23] Brola stepped back from his managerial role.[24] From time to time, Brola would make short term loans to Credit Glory.[25]

**D.    Lundgren's Termination**

On February 3, 2022, Brola terminated Lundgren from Credit Glory for misconduct.[26] Brola was President and CEO of Credit Glory at the time; Lundgren was the Company's Secretary.[27] Four days later, on February 7, Lundgren was sent a letter informing him of his termination.[28] The letter explained that the Company

---

[21] JX 7; Brola Dep. 22; *id.* at 23; *see* PTO ¶ 6.

[22] JX 7.

[23] Brola Dep. 32-33.

[24] Brola Tr. 33-34; Brola Dep. 33.

[25] Brola Dep. 85.

[26] JX 11.

[27] Brola Dep. 88; *see also* Brola Tr. 12, 15.

[28] JX 11.

had "received several complaints" about Lundgren's concerning misconduct, including "alleged . . . violat[ions] [of] applicable law."[29]

The termination letter stated that the "only remaining issue" was the disposition of Lundgren's stock.[30]  It offered two accommodations to Lundgren:

> 1. [Credit Glory] w[ould] amend its certificate of incorporation to provide for a separate class of common stock that is non[-]voting and [Lundgren's] [s]tock w[ould] be converted to [it].
>
> 2. [Credit Glory] w[ould] continue to indemnify [Lundgren] . . . .[31]

After Lundgren's termination, Brola no longer consulted Lundgren about Credit Glory's affairs.[32]

### E.    This Litigation

Two months after his termination, on April 15, 2022, Lundgren filed this lawsuit.[33]  He sought judicial dissolution of Credit Glory under 8 *Del. C.* § 273 and the appointment of a receiver.[34]

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 1.  In return, Lundgren was expected to pay Credit Glory $70,000 for expenses he incurred for a separate business Lundgren owned.  *Id.* at 2.

[32] Brola Dep. 42 (explaining that Lundgren was no longer consulted about Credit Glory operational decisions because "[h]e wasn't an employee any longer"); *see* Brola Tr. 41.

[33] Dkt. 1.

[34] *Id.* ¶¶ 51-32.

On August 5, 2022, Lundgren amended his petition, seeking the same relief but adding more allegations.[35]

In September 2022, Brola moved to dismiss the petition, arguing, among other things, that the petition was brought in bad faith.[36] The case stalled.[37] Lundgren waited over a year—until December 2023—to oppose the motion to dismiss.[38] After briefing and oral argument, I denied the motion by bench ruling in August 2024.[39] I told the parties that the case would be set for a prompt one-day trial to bring this protracted summary proceeding to a close.[40]

Discovery began. More accurately, Brola served discovery requests that Lundgren rebuffed. Discovery motions practice and letter writing campaigns to the court flourished. Eventually, trial was set for May 2025. Lundgren filed his opening

---

[35] Dkt. 15.

[36] Dkt. 21.

[37] *See* Dkts. 39-40.

[38] Dkt. 43.

[39] *See* Tr. of Telephonic Rulings of the Ct. on Mot. to Dismiss (Dkt. 52) ("MTD Bench Ruling") (holding that the court could not, at that procedural posture, resolve whether the petition was brought in bad faith).

[40] *Id.* at 24.

pre-trial brief on April 25, 2025.[41]  Brola filed a responsive pre-trial brief on May 9.[42]

Lundgren then asked for a continuance, which I granted.  Trial went forward on June 30.

At trial, two motions were presented for resolution along with the petition. First, Brola moved for contempt and discovery sanctions against Lundgren.[43] Second, Lundgren sought a default judgment that would obviate trial.[44]  I denied the second motion,[45] and took the first under advisement.

## II.    ANALYSIS

Section 273 permits the Court of Chancery to dissolve a joint venture corporation with two stockholders when three factors are present: (1) the corporation has "only 2 stockholders each of which own 50% of the stock," (2) who are "engaged in the prosecution of a joint venture," and (3) are "unable to agree upon the

---

[41] Opening Pre-trial Br. of Pet'r (Dkt. 124).

[42] Resp't's Pre-trial Br. (Dkt. 131).

[43] *See* Resp't's Mot. for Contempt and Discovery Sanctions (Dkt. 110) ("Contempt Mot."); Pet'r's Resp. to Mot. for Contempt and Sanctions (Dkt. 114) ("Contempt Opp'n"); Resp't's Reply in Further Supp. of Mot. for Contempt and Discovery Sanctions (Dkt. 118) ("Contempt Reply").

[44] Pet'r's Mot. for J. by Default or on the Pleadings (Dkt. 146); Resp't's Answering Br. in Opp'n to Pet'r's Mot. for J. by Default or on the Pleadings (Dkt. 150); Reply to Resp. to Mot. for Default or on the Pleadings (Dkt. 153).

[45] Dkt. 155.

desirability of discontinuing such joint venture and disposing of the assets used in such venture."[46] "The purpose of the statute is to afford relief where the corporation's two equal shareholders are deadlocked and cannot agree upon whether the joint venture should be continued and how the corporation's assets should be disposed of."[47]

Each of Section 273's three requirements must be proven by the petitioner. "Once the requirements of [Section] 273 are met, the exercise of [the court's] discretion is limited to a determination of whether or not a bona fide inability to agree exists between the two shareholders."[48] The burden of proof then shifts to the party opposing dissolution to show the petitioner has an improper purpose or is otherwise acting in bad faith.[49]

The parties debate not only Section 273's minimum requirements, but also whether Lundgren's petition is legitimate. Their arguments present the legal question of whether Wills' phantom shares make him a third stockholder, defeating

---

[46] 8 *Del. C.* § 273.

[47] *In re Coffee Assocs., Inc.*, 1993 WL 512505, at *3 (Del. Ch. Dec. 3, 1993).

[48] *In re Arthur Treacher's Fish & Chips*, 1980 WL 268070, at *4 (Del. Ch. July 1, 1980).

[49] *Id.* at *3 (stating that because the petitioner met Section 273's elements, the court would only deny dissolution if the respondent could demonstrate "illegality or actual fraud," or "bad faith").

the application of Section 273.[50]  They also raise provocative factual questions on whether Lundgren brought the petition to avenge his firing from Credit Glory.

After trial, one necessary factor is so plainly wanting that I need not explore the remaining issues.  Lundgren failed to prove that he and Brola were engaged in a joint venture.  His petition fails on that basis alone.

I begin my analysis by explaining why Credit Glory is not a joint venture.  I next assess Brola's motion for sanctions.  I enter judgment for Brola on the merits, and award him sanctions due to Lundgren's contempt.

## A.    Joint Venture

A joint venture requires "(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, [and] (5) a duty to share in the losses which may be sustained."[51]  "Whether or not a joint venture relationship was intended is essentially a factual determination."[52]

---

[50] *See* MTD Bench Ruling 13-14 (holding, at the pleading stage, that it was "reasonably conceivable that Wills is not a stockholder as contemplated by Section 273"); Resp't's Pre-trial Br. 21.

[51] *Warren v. Goldinger Bros.*, 414 A.2d 507, 509 (Del. 1980) (quoting *Kilgore Seed Co. v. Lewin*, 141 So.2d 809, 810-11 (Fla. Dist. Ct. App. 1962)).

[52] *Coffee Assocs.*, 1993 WL 512505, at *5.

"A community of economic interest . . ., without more, is not sufficient to create a joint venture."[53]  Nor is a business's joint operation for mutual benefit.[54] Those factors are "descriptive of all corporations having a small number of shareholders."[55]  For a closely held corporation to be deemed a joint venture, there must be "a voluntary agreement between two or more parties."[56]

The agreement need not be formal.[57]  It may be "express or implied, evidencing the parties' intent to engage in a business enterprise of that kind."[58]  But an agreement of this sort is the "essential element" differentiating a joint venture from other business enterprises.[59]

Lundgren proved no such voluntary agreement.  Instead, the record establishes that Brola never intended to form a joint venture with Lundgren.  Several facts make that apparent.

---

[53] *Id.* (citing *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 502 (Del. 1959)).

[54] *Id*. at *6.

[55] *Id*.

[56] *Id*.

[57] *See Consol. Fisheries Co. v. Consol. Solubles Co.*, 112 A.2d 30, 35 (Del. 1955) (explaining that "[n]o particular formality" is required).

[58] *Coffee Assocs.*, 1993 WL 512505, at *5.

[59] *Id.*

First, Lundgren played no role in Credit Glory's formation. Credit Glory was founded by four other individuals four years before Lundgren became involved.[60] When Lundgren was hired by Brola and Wills in 2019, it was for a marketing role.[61] Lundgren had a "typical employer/employee relationship" with Brola rather than a partnership.[62]

Second, although Lundgren's role evolved, Brola always viewed Lundgren as an employee.[63] Brola held the CEO or President title and, after Wills left, Lundgren did not become Brola's partner or co-venturer.[64] Lundgren lacked an "equal voice in important decisions" about the Company's strategic direction.[65] When Brola terminated Lundgren, Lundgren was no longer consulted about Credit Glory's affairs.[66]

---

[60] *See* JX 1; Brola Dep. 13-14.

[61] *See supra* note 14 and accompanying text; *see also* Robinson Tr. 91-92.

[62] *Haley v. Talcott*, 864 A.2d 86, 90 (Del. Ch. 2004) (holding that a joint venture existed where an employment contract "establish[ed] a relationship more similar to a partnership than a typical employer/employee relationship").

[63] *See* Brola Tr. 14-15 (testifying that he and Lundgren "never discussed" operating Credit Glory as a "partnership or joint venture or something like that").

[64] *See id.* at 13-14.

[65] *Wah Chang Smelting & Refin. Co. of Am., Inc. v. Cleveland Tungsten Inc.*, 1996 WL 487941, at *7 (Del. Ch. Aug. 19, 1996).

[66] *See supra* note 32 and accompanying text.

Finally, Lundgren's grant of Credit Glory equity does not show that Brola wanted to partner with him. Brola and Wills gave Lundgren equity to compensate and incentivize their employee.[67] Lundgren's equity stake becoming equal to Brola's was a matter of happenstance, not design, due to Wills' unrelated departure. These facts are markedly different from cases where individuals agree to combine their skills and resources in the pursuit of a mutually beneficial business enterprise.[68]

Though Credit Glory was deliberately and jointly formed by several persons, Lundgren was not one of them. Lundgren was merely an employee. Without a voluntary agreement with Brola to form a joint venture, relief under Section 273 is unavailable.

## B. Sanctions

Just before trial, Brola moved for contempt and discovery sanctions against Lundgren.[69] Brola invokes this court's inherent authority to sanction parties for

---

[67] *See* Brola Tr. 14-15 (testifying that Lundgren was given equity because Credit Glory "didn't really have money to pay him to do a good job").

[68] *See Wah Chang*, 1996 WL 487941, at \*6; *Sheppard v. Carey*, 254 A.2d 260, 264 (Del. Ch. 1969) (holding that the combination of the parties' skills and property, and agreement to co-manage the company, demonstrated a joint venture).

[69] *See supra* note 43 and accompanying text. Testimony in connection with the motion was elicited at trial.

contempt and to compel compliance with its orders.[70]  He also cites Court of Chancery Rule 70(b), which authorizes the court to make a contempt finding "[f]or failure . . . to obey or to perform any order[.]"[71]

To find a party in contempt, "the party to be sanctioned must be bound by the order, have clear notice of it, and nevertheless violate it in a meaningful way."[72] Brola has met his burden.  I issued several clear discovery orders in this case. Lundgren consistently and blatantly failed to comply with them, despite his knowledge of their terms.

First, on December 19, 2024, I entered an order granting Brola's motion to compel.[73]  The motion to compel concerned Lundgren's "refus[a]l to collect and produce any documents" in response to Brola's request for production.[74]  My order directed the parties to "immediately confer on a document collection, search, and review protocol," mandated that Delaware counsel "be directly involved in

---

[70] *DiSabatino v. Salicete*, 671 A.2d 1344, 1348 (Del. 1996) (stating that the court has "an inherent contempt authority as a power necessary to the exercise of all others" (citation omitted)).

[71] Ct. Ch. R. 70(b).

[72] *TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630, 644 (Del. 2022).

[73] Dkt. 78.

[74] Dkt. 66 ¶ 4.

document collection and review," and set a document production deadline of January 10, 2025.[75]

Lundgren failed to comply. He did not direct his counsel to meet and confer on a discovery protocol with opposing counsel. He failed to even involve his Delaware counsel in document collection. Instead, he improperly self-collected documents he "thought w[ere] responsive."[76] He also missed the January 10, 2025 production deadline.

On January 30, I denied a show-cause motion filed by Brola but expressed "deep[] concern[]" over Lundgren's failure to comply with my December 19, 2024 order.[77] I ordered that a telephonic status conference be held at which Lundgren's counsel was "to address (1) when he met and conferred with Brola's counsel; (2) how Lundgren's documents were collected; (3) what sources of data were searched; (4) what search terms were applied; and (5) the status of Lundgren's Discord account."[78]

---

[75] Dkt. 78.

[76] Contempt Mot. Ex. B (quoting Lundgren's counsel).

[77] Dkt. 93.

[78] *Id.*

That status conference took place on February 3.[79]  During it, Lundgren's counsel admitted that his client had self-collected a handful of documents, with no other collection efforts made.[80]  I explained that Lundgren's baseline discovery obligations—collecting and reviewing documents—were unmet.[81]  I (again) directed Lundgren's counsel to investigate potential data sources, to file a letter in five days detailing these findings, and to confer with Brola's counsel on a discovery protocol ten days later.[82]  Lundgren did not comply.

On February 21, I filed a minute order directing Lundgren to respond to foundational discovery questions posed by Brola in a February 20 letter.[83]  These questions included the source of a Google Drive controlled by Lundgren, whether other sources like personal emails or messaging apps had been searched, and what steps were taken to ascertain available data.  Lundgren again failed to comply, filing unrelated and frivolous letters instead.[84]

---

[79] *See* Dkts. 95-96.

[80] Dkt. 106 at 6-7.

[81] *Id.* at 9.

[82] *Id.* at 12-13.

[83] Dkt. 98; *see* Dkt. 97 Ex. B at 5-6.

[84] Dkt. 99; *see also* Dkts. 101, 104.

Finally, on February 28, I entered a scheduling order that set a document production "substantial completion" deadline of March 7, and a privilege log deadline of March 12.[85]  Lundgren missed both.[86]

On March 20, Lundgren produced just eighteen documents, without metadata, that were self-selected from his Google Drive.[87]  One of those documents was a series of Signal and Discord "screen shots" that Lundgren curated and annotated with his view of the facts.[88]  He did not make a subsequent production or provide a privilege log.[89]

These are not minor violations.  Lundgren consistently and repeatedly ignored discovery orders, making an already drawn-out proceeding even less efficient.  He had ample notice of his obligations.  He was given repeated opportunities to comply.  And though he was the proponent of this case, he seemed to feel that he did not have to participate in discovery.

---

[85] Dkt. 107.  I also told Lundgren that he should focus on complying with his discovery obligations rather than writing imprudent letters.  *Id.*

[86] *See* Contempt Reply ¶ 13.

[87] *See* Lundgren Dep. 31.

[88] JX 10; *see* Lundgren Tr. 84-87.

[89] *See* Contempt Reply ¶ 14.

Lundgren's primary defense—that he is an individual and not a large corporation—is unavailing.[90] A party's individual status does not excuse it from basic discovery obligations.[91] Lundgren's assertion that his violations are "hyper technical" is also meritless. He did not satisfy the core requirements of my orders, including to produce documents, provide metadata, create a privilege log, and adhere to a schedule. These violations prejudiced Brola's ability to prepare for trial and caused needless expense, burden, and delay.

Lundgren is in contempt several times over. This court must "be diligent in the imposition of sanctions upon a party who refuses to comply with discovery orders . . . ."[92]

Brola asks that I award him attorneys' fees and costs associated with his motion to compel, his efforts to prompt Lundgren to comply with discovery, and his motion for sanctions.[93] I decline to retroactively award fees and costs for the motion

---

[90] *See* Contempt Opp'n ¶ 14 ("Unlike CREDIT GLORY INC [sic] Petitioner is not a corporation."); *id.* ¶ 25 (stating that Lundgren "is not a large corporation with countless archival records to search").

[91] *See, e.g.*, *In re ExamWorks Gp., Inc. S'holder Appraisal Litig.*, 2018 WL 1008439, at *1 (Del. Ch. Feb. 21, 2018) (awarding sanctions against petitioners who "failed to produce any documents during the period allotted for fact discovery and said nothing about any delays in production" before producing 68,052 pages of documents six weeks after the discovery cutoff).

[92] *Hoag v. Amex Assurance Co.*, 953 A.2d 713, 717 (Del. 2008).

[93] Contempt Mot. ¶ 37.

to compel, which were not granted when I ruled on that motion. I will, however, award Brola the reasonable fees and costs he incurred due to Lundgren's non-compliance with my discovery orders after December 19 and in moving for sanctions. But for Lundgren's contempt, Brola would not have incurred those expenses. Fee-shifting is an appropriate remedy for contempt where it serves a remedial function.[94]

## III. CONCLUSION

Lundgren is not entitled to relief under Section 273. Judgment is entered for Brola.

Lundgren is in contempt. Within 14 days, Brola's counsel must submit a Rule 88 affidavit outlining the fees and costs caused by (1) Brola's efforts to cause Lundgren to comply with my discovery orders, and (2) the motion for sanctions. Lundgren will then have 14 days to file any response to the fee affidavit.

IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[94] *See Kurz v. Holbrook*, 2010 WL 3028003, at *1 (Del. Ch. July 29, 2010) (collecting authorities); *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *16-17 (Del. Ch. Sept. 29, 2023).